**UNITED STATES of America,**
**Appellee,**

v.

**Anthony F. FALANGE, Delwright Thom-**
**as Dyman and Rocco Joseph**
**Taurisano, Appellants.**

**Nos. 556, 733, Dockets 33945, 34682, 34555.**

United States Court of Appeals,
Second Circuit.

Argued March 23, 1970.

Decided May 19, 1970.

Kenneth P. Ray, Utica, N. Y., for appellant Falange.

Moses Goldbas, Utica, N. Y., for appellant Taurisano.

Louis T. Brindisi, Utica, N. Y., for appellant Dyman.

Hays Gorey, Jr., Dept. of Justice, Washington, D. C., (James M. Sullivan, Jr., U. S. Atty., for Northern District of New York, Thomas A. Kennelly, Donald E. Campbell, Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before LUMBARD, Chief Judge, HAYS, Circuit Judge, and BLUMENFELD, District Judge.*

BLUMENFELD, District Judge:

Following a joint trial before the jury, appellants Falange, Taurisano and Dyman were convicted of conspiring, among themselves and with others, to transport stolen money and property of a value of $5000 or more in interstate commerce in violation of 18 U.S.C. § 2314. They appeal on the ground that the trial judge committed errors during the trial and in his charge to the jury. We affirm the convictions.

It would serve no useful purpose to recite in complete detail all of the facts the jury could have found. A brief sketch will suffice to put the claimed errors in perspective.

The government's case rested primarily on the testimony of Zarnoch and Elias, unindicted co-conspirators who testified to an agreement to which all were parties with the single objective of burglarizing a home in Elizabethtown, North Carolina, owned and occupied by a local department store owner, a Mr. Baddour, and his wife, both elderly. Zarnoch testified that the parties to the agreement had been informed that $100,000 was secreted in a certain place within the house and that the two occupants rarely left the house other than to go to church on Sunday.

Both Dyman and Falange assured Zarnoch that it was "a good score," Falange saying, "When I give you something and tell you it is good, you better believe it, or I will give it to someone else." Falange gave Dyman $400 for expenses and told him to make sure that he got his end of a four-way split. About a week later, Zarnoch, Dyman and Taurisano drove from Utica, New York, to

---

* Of the District of Connecticut, sitting by designation.

Fayetteville, North Carolina, where they stayed at the Americana Motel. That evening Dyman and Zarnoch drove to Elizabethtown and located the house. The next day the three of them went to Elizabethtown "to get a better look and check out the score." They refined their plans to burglarize the Baddour house and make their get-away. However, Taurisano's insistence that the three of them should hold up the intended victims, against the objections of Dyman and Zarnoch, served to abort the burglary attempt at that time, and they returned home to Utica the next day. About six months later, Elias and Tebsherany (who was tried and convicted with these appellants but did not appeal) joined the others in the conspiracy. Taurisano had a part in enlisting them as additional members. He and Zarnoch told Elias that they had been to North Carolina, that it was a good "score" and that there was at least $100,000 there. Falange conferred privately with Elias and in addition to telling him where the money was told him that it was his "score" for which he expected 20% of the take, and that if there was any jewelry it was to be sold through him.

On the morning following Falange's conversation with Elias, Elias, Dyman and Tebsherany drove straight to Fayetteville, North Carolina. A few days later, on a Sunday morning while the Baddours were at church, they burglarized the house. They found about $1000 in coins where they had been told to look and took that amount with them back to Utica. Disappointed at not finding the $100,000 they refused to give Falange any share.

We turn now to a consideration of the several errors asserted.

## I.

During the voir dire examination of prospective jurors, defendants' counsel learned that the government had conducted some investigation into records containing information about the panel of jurors who had been summoned for jury duty. After the jury was selected and sworn, the defendants were permitted an opportunity to conduct an inquiry into the nature and extent of the government's investigation.

The hearing disclosed that a list of the panel was obtained by the government's attorneys from the court clerk. They referred it to the FBI at Albany for "any information in your files which would be of any interest to the Government in this case." A check for information was made through the credit bureaus at Rome and Syracuse, the area from which the panel was drawn. Inquiry was made of two members of the Utica Police Department, two members of the New York State Police, a Special Agent of the FBI and Chief of Intelligence of the FBI in Buffalo. Some challenges exercised by the government were in reliance upon information obtained through the investigation.[1]

The defendants contend that it was error to deny their motion to withdraw the jury. No claim is made that any of the jurors were approached by anyone in behalf of the government or that any juror knew of the inquiries.

The defendants' argument that the exercise of challenges based on information about jurors obtained through investigation resulted in a jury that was not impartial is presented in the form of a rhetorical question: " * * * can it honestly be said that the government's investigation was not designed to secure a jury favorable to the government's position?" The more appropriate question is, can it be said that the jury which was sworn was prejudiced against the defendants. Cf. United States v. Wood, 299 U.S. 123, 146, 57 S.Ct. 177, 81 L.Ed. 78 (1936).

An investigation of prospective jurors pointedly directed toward uncovering possible bias against the government was made in United States v. Costello, 255 F.2d 876, 882 (2d Cir.), cert. denied,

---

1. The government had only six challenges; the defendants were allowed fourteen.

357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551, rehearing denied, 358 U.S. 858, 79 S.Ct. 16, 3 L.Ed.2d 93 (1958). That was a case of a prosecution for income tax evasion, where an examination was made by the government of the income tax returns of many members of the jury panel "in an effort to find out whether [they] had income tax troubles of their own or had other reasons to be unfavorably disposed to the Government." *Id.* at 255 F.2d 882. We held in *Costello* that the investigation furnished

"utterly no basis for the contention that it resulted in a jury 'specially conditioned' to convict or otherwise biased or prejudiced against the defendant. At most, the practice led to challenges of jurors who might have been unduly biased in favor of the defendant. The exercise of peremptory challenges is a rejective, rather than a selective, process of which the appellant has no right to complain." *Id.* at 884.

The fact that some members of the panel were challenged does not mean that those who were not were biased or prejudiced.

The defendants' arguments that to permit such an investigation of prospective jurors as occurred here will discourage citizens from serving as jurors were dismissed in *Costello* as "far fetched bogies." *Id.* at 883. The additional contention that it is fundamentally unfair to deprive defendants of a similar opportunity was rejected in Best v. United States, 184 F.2d 131, 141 (1st Cir. 1950), cert. denied, 340 U.S. 939, 71 S. Ct. 480, 95 L.Ed. 677 (1951), where Chief Judge Magruder upheld the denial of a defendant's motion to be allowed to inspect and use an FBI report of its investigation of the veniremen. See also, Martin v. United States, 266 F.2d 97, 99 (5th Cir. 1959); Christoffel v. United States, 84 U.S.App.D.C. 132, 171 F.2d 1004, 1006 (1948), rev'd on other grounds, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949).

We conclude that the denial of the motion to withdraw the jury was not an abuse of discretion.

## II.

■ Although recognizing the long-standing rule that "[f]ederal law does not require corroboration of accomplice testimony to sustain a conviction," United States v. Corallo, 413 F.2d 1306, 1323 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969), appellants contend that Judge MacMahon failed to give sufficient cautionary instructions to the jury with regard to accomplice testimony.

Defense counsel requested, as is not unusual in a case where conviction must rest almost entirely on the testimony of co-conspirators, a charge in the following form:

"Such testimony is to be given close and searching scrutiny and is to be received with caution and weighed with great care. You should not convict a defendant on the unsupported testimony of an accomplice unless you believe the unsupported testimony beyond all reasonable doubt."

Judge MacMahon declined to give the instruction in that form. Nevertheless, we are persuaded that his charge more than adequately instructed the jury on the special care to be accorded accomplice testimony.

Judge MacMahon instructed the jury generally with regard to assessing the credibility of witnesses, held sufficient as to accomplice testimony in United States v. Cianchetti, 315 F.2d 584, 592 (2d Cir. 1963). In addition, he specifically instructed the jury with respect to the testimony of the accomplice witnesses Elias and Zarnoch: " * * * [Y]ou must scrutinize their testimony with special care and act upon it with caution." Moreover, this cautionary instruction followed directly after a considerably detailed review of the many factors in the case bearing upon their credibility; their admitted participation

in the crime alleged and their commission of others; the evidence of their prior inconsistent statements to others relating to expected leniency at the hands of the government; the government's payment for support of Elias' wife; and possible motives of revenge and hostility toward the defendants. Judge MacMahon's instructions were more than sufficient on this issue.

### III.

The indictment alleged a single conspiracy, and the judge instructed the jury that if "the Government has failed to prove the existence of one overall conspiracy, you must find the defendants not guilty. Proof of two or several separate and independent conspiracies involving various of the defendants, although such separate conspiracies had the same objective, is not proof of the conspiracy charged in this indictment."

■ Two separate claims of error are made. One is that this instruction was equivalent to a charge that a defendant could not be acquitted without also acquitting his co-defendants. The second is that there was not substantial evidence from which a jury could find a single conspiracy. At the outset we observe that no exception was taken to this charge.[2]

Whether there was only one conspiracy presents one question; whether, if so, any defendant was a member of that conspiracy presents another. The jury was instructed that if they found more than one conspiracy, all defendants were to be acquitted; and, if they found a single conspiracy but that one or more of the persons charged were not members of it, such persons were to be acquitted. Each defendant was given the benefit of both defenses. We are unable to comprehend any error in this.

■ It was the trial judge who noted the possibility that the evidence might support an inference that there were two separate agreements,[3] one of which ended when Taurisano, Zarnoch and Dyman returned empty handed after their first trip to Fayetteville, and another made some five or six months later to which Elias and Tebsherany were also parties. We do not need to rely on any "so-called presumption of continuity * * * as to all the participants of a conspiracy which intends a single act," United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), such as the burglarizing of a particular house, in holding, as we do, that there was ample evidence of a single overall conspiracy. Taurisano's argument that as to him the original agreement came to an end when Zarnoch and Dyman would not agree with him to a hold-up of the Baddours is negated by testimony of Elias that Taurisano and Zarnoch told him that they had been to North Carolina, that it was a good "score" and that there was at least $100,000 there.

The jury was unquestionably entitled to find as to Taurisano, as well as to the other defendants, that the two trips to Elizabethtown were part of a single overall conspiracy to burglarize the Baddour house, rather than two separate ones. Proof of the accomplishment of the original objective is very persuasive evidence that one conspiracy existed from the beginning. The issue for the jury was strongly fact oriented, and the charge was in keeping with the sense of the pronouncements by this court in *Borelli, supra,* 336 F.2d 376. It did not misguide the jury.

---

2. When the opportunity was given to make objections to the charge as provided by Fed.R.Crim.P. 30, the only remarks on this point were by one of defendants' counsel, who said: "It is my understanding—this is not an exception. It's my understanding, if there were more than one agreement to go down to North Carolina, then the jury must acquit; is that right?" The court replied: "If they find two separate conspiracies, they must acquit, which none of you asked me to charge, by the way."

3. *See* note 2, *supra.*

## IV.

■ Appellants complain of error in denying the motion to strike the pre-trial photographic identification of Dyman by the clerk at the Fayetteville motel because three of the sixteen photographs shown were of Dyman. But the trial judge found that the duplicate photographs were taken years apart and showed the subject from different angles. We agree that their inclusion in the group of photographs did not render the pre-trial identification of Dyman "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to constitute denial of due process. Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). See Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). There was no absence of "fundamental fairness," particularly in view of the fact that at the trial a handwriting expert identified the signature "Delwright Dyman, Utica, New York," appearing on the registration cards at the Americana Motel in Fayetteville on the date of the first trip to North Carolina as the handwriting of Dyman.

## V.

■ Taurisano's contention that the evidence is insufficient to sustain his conviction is too frivolous to merit discussion. Cf. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Nor is there merit in his contention that the trial judge abused his discretion in denying Taurisano's motion for a severance. See Fed.R. Crim.P. 14. Cf. United States v. Carella, 411 F.2d 729, 731 (2d Cir.), cert. denied sub nom. Erhart v. United States, 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969); United States v. Kahn, 366 F. 2d 259, 263–264 (2d Cir.), cert. denied, 385 U.S. 948, 87 S.Ct. 321, 17 L.Ed.2d 226 (1966).

## VI.

■ We have considered appellants' other claims of error and find them without merit. It was not error for the trial judge to deny a continuance for the purpose of producing a nephew of the victim who allegedly had given the conspirators certain information about the amount and location of the money in his uncle's home. It is clear from the record that appellants knew of the existence of such a person at least a week before requesting a continuance, that they made no effort to secure his presence, and that they had no genuine interest in securing his testimony, which in any case was of doubtful relevance.

■ Finally, the record reveals that the prosecutor did not stray too far beyond the scope of cross-examination when examining co-conspirator Zarnoch on redirect. His questions to Zarnoch relating to crimes the latter may have committed with "other people" were not improper in their context, especially in view of defense counsel's failure to object. Cf. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (*en banc*), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

Affirmed.