**UNITED STATES of America,**
**Appellee,**

v.

**Arthur J. COBB, Defendant-Appellant.**

**No. 1030, Docket 71–1391.**

United States Court of Appeals,
Second Circuit.

Argued July 2, 1971.

Decided Aug. 12, 1971.

Ivan S. Fisher, New York City (Albert J. Krieger, New York City, on the brief), for defendant-appellant.

Howard Wilson, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, and William B. Gray, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FEINBERG and MANSFIELD, Circuit Judges, and BARTELS, District Judge.[*]

BARTELS, District Judge:

Under a fourteen-count indictment, Arthur J. Cobb was convicted together with his co-defendant, Abraham Goldstein, of conspiracy to defraud the United States in the ascertainment and collection of certain information used by the Internal Revenue Service in determining tax liability of the defendants and others, and also of violation of 26 U.S.C. § 7206(2), in procuring and causing the preparation and presentation of fraudulent and false United States Information Returns (Form 1099). Count 1 charged both Cobb and Goldstein with conspiracy to defraud the United States and to violate 26 U.S.C. § 7206(2) from August 1, 1964 to October 16, 1970, and Counts 2 through 14 charged Cobb and Goldstein with the substantive offenses of advising and causing the preparation of false and fraudulent United States Information Returns (Form 1099) on thirteen occasions between August 21, 1965 and September 24, 1966, which misrepresented and concealed the names of the recipients of income from winning pari-mutuel twin double tickets at Yonkers Raceway. Cobb was convicted on Counts 1 and 4 and acquitted on Count 10, the jury disagreeing on the remaining counts, and Goldstein was convicted on all counts except Count 10. Cobb was sentenced to imprisonment for six months and to probation for five years on Count 1, and sentence was suspended on Count 4. Goldstein has not appealed.

At the outset it is instructive to describe the system devised by Cobb and Goldstein to avoid tax liability for the income received from cashing winning twin double tickets.[1] Upon redeeming a winning ticket in excess of $600, the ticketholder is required by the racetrack to complete a verification slip setting forth his name, address and Social Security number. The racetrack then files, in accordance with 26 U.S.C. § 6041(a), a United States Information Return (Form 1099) with the Internal Revenue Service, containing the same information as the verification slip. Thus the Internal Revenue Service is provided with a record of an individual's twin double winnings and can verify whether a taxpayer has reported all of his income in a particular year. To conceal from the Internal Revenue Service the true owners of the tickets and the actual recipients of the proceeds, Cobb and Goldstein concocted a scheme of selecting and engaging certain persons who had a sufficient number of losing tickets as "cashers" who would cash these twin double tickets in their own names and thus save the defendants, their princi-

---

[*] Of the Eastern District of New York, sitting by designation.

[1.] In 1964, 1965 and 1966 Yonkers Raceway and Roosevelt Raceway conducted a system of pari-mutuel betting known as the "twin double." Under this system, a bettor purchased a ticket which contained his choice of the two horses which would win the sixth and the seventh races. If the bettor's choices should win, the bettor had what was known as a "live" ticket which could then be exchanged at the betting windows for a second ticket which contained his choices for the eighth and ninth races. If the bettor's choices again won, he had a winning twin double ticket which could be cashed in at a cashier's window at the racetrack.

pals and others from imposition of taxes upon the twin double winnings.

Cobb claims as error (1) the admission of certain testimony against him which was applicable only to Goldstein; (2) the submission to the jury as against him of the twelve substantive counts, and (3) the court's charge relative to confessed perjurers.

In order to determine the validity of Cobb's contentions, we believe it is necessary to briefly review the testimony and evidence. The Government's case rested essentially upon the testimony of three cashers, Lawrence Strauss, Lawrence Siovitz, and Irwin Steinberg, and also upon the testimony of an Internal Revenue Agent, Graham R. Schatz.

Strauss testified that he first met Cobb at Yonkers Raceway in the fall of 1964; that Cobb later told him that he was a partner of Goldstein and others dealing in twin doubles; that between the latter part of 1964 and the middle of 1965 he cashed tickets for them on approximately ten occasions; that without remembering the precise dates or amounts of the winning tickets, he received the tickets from Cobb, turned the proceeds over to Cobb and received a commission from Cobb; that on several occasions he saw Cobb deliver the proceeds to Goldstein. Strauss identified two checks, each bearing Goldstein's signature, as representing the proceeds of winning tickets given him by Cobb, one of which was the subject of Count 4 of the indictment, and testified that in the course of both transactions he turned over the proceeds to Cobb and received a commission from Cobb.

Siovitz testified that after a conversation with Cobb on August 21, 1965, he cashed in 1965 and 1966 winning twin double tickets for two groups of people, one of which was Cobb and Goldstein. He then identified twelve separate cashings which formed the basis for the substantive counts 2, 3, and 5 through 14. He also stated that he received a check from the racetrack on each occasion and identified each such check at the trial.

All the checks, except the one relating to Count 10, bore the endorsement of Goldstein. He further testified that Goldstein gave him the tickets and received the proceeds on some but not on all occasions; that he was uncertain whether Cobb gave him any of the tickets but that Cobb "probably" paid him a commission on some of the transactions, and that he cashed a ticket which he received from Cobb after he had seen Goldstein give the ticket to Cobb, identifying the check received, which bore Goldstein's signature. He added that on November 8, 1967, he met with Goldstein and Cobb at Madison Square Garden and was urged by Goldstein not to tell a grand jury before which Siovitz was scheduled to testify that he, Siovitz, had cashed the tickets for Goldstein.

Steinberg, the third casher-witness, testified that he saw Goldstein and Cobb together at Yonkers Racetrack and Roosevelt Raceway on numerous occasions during 1965 and 1966, and that on approximately thirteen occasions he cashed winning twin double tickets for Goldstein. He gave no further testimony as to Cobb's role, if any, in the transactions.

Agent Schatz testified that Cobb admitted to him that he had given winning twin double tickets to other persons to cash, although Cobb would not sign a written statement to that effect.

### Steinberg's Testimony

██ Cobb argues that the court erred in admitting Steinberg's testimony without a curative instruction to the jury that such testimony was to be considered only as against Goldstein, and that the proof showed separate conspiracies with Goldstein as the "hub" and the three casher-witnesses and Cobb as individual "spokes" in the conspiratorial wheel. He maintains that he was in no way linked to the claimed Goldstein-Steinberg conspiracy and that Steinberg's testimony was therefore prejudicial to him in convicting him of conspiracy, citing Kotteakos v. United States, 328 U.S.

750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We disagree.

The indictment charged and the proof showed a single conspiracy on the part of Goldstein and Cobb to hire various cashers to dispose of winning twin double tickets. The testimony of Strauss and Siovitz was more than ample to support a jury finding that in 1965 and 1966 Goldstein and Cobb were engaged in a single enterprise for the benefit of themselves and one or more unnamed principals. There was no evidence indicating that Cobb had withdrawn from the conspiracy in 1965 or 1966, and accordingly it was proper for the jury to find that the Goldstein-Steinberg transactions occurred in furtherance of the Cobb-Goldstein conspiracy and to charge Cobb with Goldstein's conduct in reaching its verdict.

Kotteakos v. United States, *supra,* is totally inapposite to the facts in this case. In *Kotteakos* the court reversed the convictions of defendants charged with a single conspiracy to obtain fraudulent government loans through the services of a common "hub" co-conspirator. There, each loan applicant was bent on obtaining such a loan for himself and was in no way connected with the other loan applicants. In contrast, the defendants' conspiracy herein had as its object a "single unified purpose" or "common end," i. e., the cashing of winning tickets while concealing from the Government the identity of the true recipient. See United States v. Rosenberg, 195 F.2d 583, 600 (2d Cir. 1952), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952); United States v. Lloyd, 425 F.2d 711 (5th Cir. 1970); Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

### The *Pinkerton* Charge

■ Cobb urges that the trial court erred in submitting to the jury the twelve substantive counts in which only Goldstein was directly implicated. These counts were based upon the testimony of Siovitz, relating to certain Goldstein-Siovitz transactions, and were submitted to the jury against Cobb on the authority of Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). However, as we have noted, the jury was unable to reach a verdict as to Cobb on these counts. Despite this failure, Cobb insists that he was prejudiced by the mere submission of the counts to the jury. Under *Pinkerton,* evidence of substantive crimes committed by one conspirator in furtherance of the conspiracy is sufficient to sustain the conviction of the other conspirators on the same substantive offenses, even though there is no evidence of direct participation by the other conspirators in the substantive offenses. In view of the fact that there was ample evidence to establish a Cobb-Goldstein conspiracy for the years 1965 and 1966, it was perfectly proper for Judge Cooper in his charge to the jury to submit these twelve counts as against Cobb. See United States v. Kellerman, 431 F.2d 319 (2d Cir. 1970), cert. denied, 400 U. S. 957, 91 S.Ct. 356, 27 L.Ed.2d (1970).

■ Even were we to assume the existence of a separate Goldstein-Siovitz conspiracy, Cobb was not convicted on any of the *Pinkerton* counts, and consequently we find no resulting prejudice to him by their submission to the jury. Cobb's conviction on the substantive Count 4 was clearly established by the testimony of Strauss with respect to the transactions Strauss had with Cobb on September 2, 1965. His assertion that he was nonetheless prejudiced in that those jurors who voted to convict on the *Pinkerton* counts must have been influenced by the submission of those counts in voting to convict him on the two counts on which he was convicted is totally without merit.

### Charge Concerning Confessed Perjurers

■ Finally, Cobb claims error in the court's instruction to the jury governing the testimony of admitted perjurers. Two of the Government's witnesses, Siovitz and Strauss, were admittedly perjurers and accomplices. In addition to giving a full charge on the question of credibility of witnesses in general,

Judge Cooper gave the following charge covering perjured witnesses and accomplices:

"As you contemplate the testimony before you of a confessed perjurer, I would suggest you might consider whether he presented an instance of purge, p-u-r-g-e or perjury. Was his testimony induced by a genuine desire to purge or clean himself of past transgressions and make amends, or did he renew the false swearing indulged in before? In other words, to use the vernacular, did he come clean before you?"

\*   \*   \*   \*   \*   \*

"And so if you find the testimony of any of these accomplices was deliberately untruthful, reject it. If upon a cautious and careful examination you are satisfied that the [accomplice] witnesses have given a truthful version and the government has sustained its burden of proof beyond a reasonable doubt in all other respects as outlined in my instructions, then you have sufficient proof on which to bring in a verdict of guilty. Otherwise, the defendants are entitled to an acquittal."

In his summation counsel for Cobb also stressed the care with which the jury should assess the testimony of admitted perjurers. While the court did not follow the language requested by Cobb concerning the evaluation of the testimony of admitted perjurers, it did caution the jury to ascertain whether the perjurer was renewing his false swearing and at the same time to subject the testimony of Strauss and Siovitz as accomplices to "a cautious and careful examination." Viewed as a whole, we conclude that the court's charge was sufficiently clear to place the jury on guard with respect to the testimony of these two witnesses.

Affirmed.