**UNITED STATES of America,**
**Appellee,**

v.

**Albert KESSLER and Maurice Stransky,**
**Defendants-Appellants.**

**Nos. 142, 143, Dockets 71-1416, 71-1417.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 1, 1971.

Decided Oct. 19, 1971.

---

Abraham Weisberg, New York City, for appellant Kessler.

John P. Garrigan, New York City, for appellant Stransky.

Howard Wilson, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., and Henry Putzel, III, Asst. U. S. Atty., Southern District of New York, on the brief), for appellee.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

PER CURIAM:

Albert Kessler and Maurice Stransky appeal from judgments entered on March 29, 1971, convicting them, after a jury trial, of conspiracy to defraud the United States in the ascertainment and collection of information used by the Internal Revenue Service (IRS) to determine tax liability. In addition to being convicted of the conspiracy charge (Count 1), Stransky was found guilty of a substantive count (Count 16), charging him with causing the unlawful preparation and presentation of a United States Information Return, Form 1099, which falsely and fraudulently named him as the recipient of $127,552.70 income from payment of a winning parimutuel "twin double" ticket issued and paid by Yonkers Raceway, Inc. on February 22, 1965.

The evidence, which must be viewed at this stage in the light most favorable to the Government, reveals a scheme on

the part of defendant Kessler, Pasquale Taddeo, Abraham Goldstein, and others to enable winners of large amounts on "twin double" pari-mutuel horse racing tickets to evade disclosure of their taxable winnings to the IRS on Forms 1099, filed by the race track pursuant to information gathered from race track "verification slips" required to be completed by winning ticketholders at the cashier's window. This was accomplished by having certain persons such as Philip Beloff, Joseph Pipitone and defendant Stransky act as "cashers" who would present the winning tickets for payment, execute verification slips representing themselves to be the owners of the tickets, collect the proceeds, and turn the cash over to one of the conspirators. For this service the "casher" was paid a commission.

■ Contending that the evidence against him was insufficient, Kessler points to the fact that the only fraudulent transactions in connection with which he is named in the indictment (after severance) were the submission of false verification slips on June 6 and 13, 1964, as alleged in Counts 4 and 6. Since he was subsequently acquitted of these two substantive charges, he urges that he should have likewise been acquitted of the conspiracy charge. This contention, however, must be rejected for several reasons. In the first place, although the evidence with respect to the events of June 6 and 13, 1964, may have been insufficient to establish each of the essential elements of the two substantive counts beyond a reasonable doubt, the proof of Kessler's involvement, when considered with other testimony, was sufficient to support the conspiracy charge. Despite Kessler's acquittal on Counts 4 and 6, there was ample other proof of his complicity in the conspiracy, which was not limited to the two dates alleged in the substantive counts but allegedly extended over a period from January 1, 1964, until April 11, 1967. For instance, Beloff testified that on other occasions in 1964 he cashed winning tickets for Kessler and that on

February 22, 1965, he saw Kessler, with Goldstein, Stransky and Taddeo, proceed to a meeting where the proceeds of a winning ticket (which had been cashed by Stransky through use of a fraudulent verification slip) were to be divided. In addition, Pipitone testified that on other occasions in 1964 he had cashed winning tickets for Kessler. This proof was sufficient, regardless of Kessler's acquittal on the two substantive counts, to convict him of conspiracy.

■ In an effort to circumvent the foregoing, Kessler contended for the first time on oral argument of the appeal that the trial court had erroneously admitted the other incriminating testimony given by Beloff and Pipitone, since the Government's Bill of Particulars, handed up upon oral argument, restricted it to the June 6 and 13, 1964, transactions. Ordinarily we would refuse to consider such a belated argument, since Kessler had ample time to brief the issue and thus afford the Government an opportunity to reply. However, the contention must in any event be rejected for the reason that the Government furnished to Kessler all specific information in its possession at the time of the request for particulars and that the testimony given by Beloff and Pipitone did not come as any surprise at trial.

■ Stransky's arguments for reversal are likewise without merit. He first suggests that his submission on February 22, 1965, of a verification slip naming himself as the owner of a twin double ticket entitled to winnings of $127,552.70 was proper because he had a partial interest in the ticket and because the form left room for only one signature. The suggestion, which is similar to that rejected in United States v. Haimowitz, 404 F.2d 38 (2d Cir. 1968), borders on the frivolous. There was ample evidence that he had no ownership interest in the ticket and that he received a commission for falsely representing himself to be the owner instead of revealing the names of the real winners, which the

verification slips sought to elicit for the purposes of Form 1099. His knowing joinder on that occasion in the unlawful scheme was sufficient to convict him of conspiracy even though he had not participated at earlier stages. United States v. Cobb, 446 F.2d 1174 (2d Cir., Aug. 12, 1971). It is Hornbook law that, having knowingly joined the single conspiracy, Stransky was accountable for the conduct of his co-conspirators in furtherance of it. Under such circumstances he was not entitled to a severance. United States v. Hutul, 416 F.2d 607 (7th Cir. 1969), cert. denied, 396 U. S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970).

 Stransky's argument that a new trial is required because of the Government's failure to produce the 1964 income tax return of Holcomb, a Government witness, for impeachment purposes, is likewise without merit. Aside from the fact that the evidence was not suppressed, it was so cumulative as to amount at best to collateral overkill with respect to a witness already the target of extensive impeachment.

The judgments of conviction are affirmed.