**UNITED STATES of America,
Appellee,**

v.

**Anthony AUGELLO and Frank Sciortino,
Appellants.**

**Nos. 113, 114, Dockets 35634, 35635.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 1, 1971.

Decided Dec. 17, 1971.

**1136**

Fergus B. Norton, Mineola, N. Y. (Byrnes & Norton, Mineola, N. Y., on the brief), for appellant Sciortino.

John J. Robinson, Atty., Dept. of Justice, Washington, D. C. (Edward R. Neaher, U. S. Atty., E.D.N.Y., Brooklyn, N. Y., Beatrice Rosenberg and Craig M. Bradley, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

After a jury trial in the United States District Court for the Eastern District of New York, appellants and a third co-defendant, Joseph Conigliaro, who has not appealed, were on June 30, 1970, found guilty of knowingly receiving stolen merchandise in foreign commerce in violation of 18 U.S.C. § 659 (Count 2) and of conspiracy to receive the merchandise in violation of that section, 18 U.S.C. § 371 (Count 1). Augello was sentenced to a term of four years imprisonment on Count 1 and seven on Count·2, to run concurrently, and Sciortino to a term of four years on both counts, to run concurrently. Both seek reversal on numerous grounds. For the reasons stated below we affirm.

The prosecution of appellants arose out of the hijacking in Brooklyn on October 19, 1965, of a truck load of clothing valued at approximately $26,000 that had arrived in New York on October 8, 1965, by ship from Hong Kong and Japan and was being transported by Genser Trucking Company to a warehouse in Maspeth, New York, at the instance of the consignee, CBS Imports. On November 5, 1965, Natale Zizzo and Vincent Garafalo were arrested for having participated in the hijacking, and a few days later, Vincent's brother, Angelo, surrendered to the police. On September 18, 1968, the three pleaded guilty to an indictment filed in the United States District Court for the Eastern District of New York, 66 Cr. 102, charging them with receiving the stolen goods in violation of 18 U.S.C. § 659. On February 11, 1970, on the basis of evidence

John Nicholas Iannuzzi, New York City (Iannuzzi & Iannuzzi, New York City, on the brief), for appellant Augello.

presented by Zizzo, who had twice testified before a grand jury in that district, an indictment was filed in the present case against the appellants and Conigliaro.

At trial the principal witnesses called by the Government were Zizzo, who incriminated both appellants, and Angelo Garafalo, who implicated Sciortino. The testimony of these two witnesses revealed that shortly before the hijacking Zizzo, an unemployed truck driver, had agreed with Conigliaro ("Joe Red") for a price of $50 to drive a "hot load" of stolen merchandise. Zizzo was then introduced at a Brooklyn bar to Augello ("Big Tony"), who confirmed the agreement and asked Zizzo to locate a drop where the stolen load might be stored. Zizzo initiated discussions about storage with his friend Angelo Garafalo, and introduced him to Conigliaro, who then arranged with Garafalo to store the load in Garafalo's barn in Commack, Long Island.

A few days later Augello dispatched Zizzo with two men to pick up a tractor-trailer labelled "Genser Trucking" containing the stolen merchandise. Zizzo drove the hijacked truck to Garafalo's barn in Commack where it was unloaded. The stolen Genser truck was later abandoned in a field in Plainview, Long Island. On the following day Augello introduced Zizzo to Sciortino ("Little Frankie") and asked them to rent a tractor-trailer to be used to transport the stolen merchandise that had been stored in Garafalo's barn.

On November 4, 1965, Zizzo and Sciortino drove to the premises of Stefano Trucking Corp. where Sciortino entered the premises while Zizzo remained outside. In about 15 minutes Sciortino returned with keys and a rental receipt for an empty rental tractor-trailer which Zizzo drove to Commack. Garafalo further testified that thereafter Sciortino, who was introduced to him by Zizzo as

"Frank" (which is in fact Sciortino's first name), stated that he "had the trucks ready" and was "going to move the stuff." The plan was that Zizzo would drive the rented truck loaded with the stolen cartons out of the barn to the Elmwood Diner where Sciortino would be waiting with his car to proceed to a new drop. When Sciortino and Garafalo initially drove toward Commack for the purpose of moving the merchandise, they suspended execution of the plan after Augello suspected that his car was being followed by police.

On November 5, 1965, Zizzo and Garafalo's brother Vincent were arrested as they drove to the barn in Commack to pick up the rental truck containing the stolen merchandise. Angelo Garafalo testified that when he and Sciortino shortly thereafter drove to the barn they saw a lot of police and FBI agents, they turned around and they drove back to the Elmwood Diner where Garafalo told Sciortino to "get lost, the cops are there."

■ Thus there was sufficient evidence introduced at trial through Zizzo, Garafalo and others from which a jury could infer that appellants Augello and Sciortino knowingly participated in a conspiracy to hijack the merchandise and in the hijacking, receipt and transportation of the goods. Appellants, pointing to various inconsistencies and weaknesses in the testimony given by Zizzo and Garafalo, and particularly to Garafalo's initial difficulty at trial in identifying Sciortino,* urged that the evidence was not worthy of belief and was insufficient as a matter of law to support the convictions. However, on the subject of the witnesses' credibility and the weight to be extended to their testimony, the jury has spoken. At this stage we must view the evidence in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. D'Avanzo, 443 F.2d

---

* There was proof that as the result of an accident in 1966, which was after the hijacking, Sciortino's facial appearance changed, in addition to which he grew a mustache.

1224, 1225 (2d Cir. 1971). Thus viewed it was clearly sufficient to permit the jury to find the defendants guilty beyond a reasonable doubt.

■ Appellants do raise other questions that are more formidable in nature. The first of these is the long delay of over 4½ years between the date of the offense and the trial. The crime occurred on October 19, 1965. The defendants were not indicted until February 11, 1970, and they were not brought to trial until June 1970. Although the long delay appears excessive on the surface, we are satisfied that it could not have been avoided by the Government and that it did not result in any substantial prejudice to the defendants.

The major part of the delay—approximately 3½ years—occurred because the Government was unable to obtain sufficient evidence to secure an indictment against the defendant until 1969. Although Zizzo, shortly after his arrest in 1965, identified a photograph of Sciortino, this was insufficient to implicate Sciortino without additional testimony or other proof, which the Government did not then have. Neither Zizzo nor Garafalo, however, was willing to testify until some time after they pleaded guilty to the indictment against them, which occurred on September 18, 1968. Garafalo testified for the first time before the grand jury on July 30, 1969. As to Zizzo it was brought out at trial that not until his second appearance before the grand jury, which occurred on October 22, 1969, did he place Sciortino at an important meeting at the Elmwood Diner with the Garafalos and himself, and that in at least one respect his testimony implicating Augello was changed at the second grand jury session. In short, the Government had a crucial but reluctant witness on its hands without whose testimony it could not have obtained an indictment or proceeded to trial against appellants.

The only substantial prejudice claimed to have resulted from the delay arises out of Zizzo's testimony identifying Sciortino as the person who, on November 4, 1965, accompanied him to Stefano Trucking Corp. for the purpose of renting the tractor-trailer to be used to haul the hijacked merchandise. Zizzo testified that Sciortino entered the premises and came out some 15 minutes later with the keys and rental receipt for the rented tractor-trailer which Zizzo then drove to the barn in Commack. An FBI report of interviews with Mario Stefano of Stefano Trucking Corp. and his employee, Miss Elm, indicated that the man who rented the tractor-trailer resembled Conigliaro more than Sciortino and gave the name "Russo," a nickname sometimes used by Conigliaro. Sciortino was unsuccessful in locating Miss Elm, whom he sought to subpoena as a witness in his defense at trial, although a recess of several days was granted by the court for that purpose. Appellants now contend that their inability to subpoena her is attributable to the Government's delay in bringing the case to trial, and that in view of Miss Elm's unavailability it was error for the district court not to have mitigated the prejudice either by reading the FBI summary to the jury or by telling the jury that there was some evidence tending to show that Sciortino had not participated in the rental of the truck.

■ There is no indication that Miss Elm would have been any more available, if the case had been tried earlier, than she was at the time of the trial. Furthermore, although Miss Elm's name was not disclosed in the indictment, it does charge (Count 1, Overt Act No. 6) that on November 4, 1965, Sciortino rented a tractor-trailer which Zizzo drove from Brooklyn to Commack. Sciortino could have moved to obtain particulars at an early stage from the Government under Rules 7 and 16, F.R. Cr.P., as to the identity of the persons from whom he allegedly rented the truck, so that he could decide whether to

call them as witnesses for the defense. This he did not do. Lastly, it is not at all clear that if Miss Elm had testified along the lines indicated in the FBI report of its interviews of her, the evidence would have been accepted by the jury as exculpatory. The Government argues, for instance, that since Zizzo waited outside for some 15 minutes while Sciortino went into the Stefano rental agency and came out with keys, it is quite possible that Conigliaro, who did not testify, was already inside the agency, arranged for the rental of the truck in the name "Russo," and gave the keys and receipt to Sciortino to take outside to Zizzo. Under all the circumstances we fail to find sufficient evidence of prejudice to warrant reversal because of delay in obtaining the indictment and bringing the case to trial. United States v. Alo, 439 F.2d 751, 754–756 (2d Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed. 2d 89 (1971); United States ex rel. Solomon v. Mancusi, 412 F.2d 88, 90 (2d Cir.), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969). Since the FBI report of Miss Elm's statement was hearsay, the court properly sustained the objection of the Government and of Conigliaro to it. V Wigmore on Evidence § 1361, pp. 2–3 (3d ed. 1940).

Another question raised by Sciortino arises out of testimony given by Sgt. Robert Creighton of the Suffolk County Police Department regarding Sciortino's reputation for truth and veracity, which was introduced after Sciortino, testifying in his own defense, had denied any complicity in the alleged conspiracy and hijacking but had admitted prior convictions for possession of stolen property. Sgt. Creighton was called as a witness by Sciortino to give testimony regarding his surveillance of Angelo Garafalo, which was offered to impeach the latter's testimony as a Government witness. On cross-examination of Creighton the Government was permitted to elicit that he had made inquiries of 12 people, some of whom lived in the community in which Sciortino resided and others in the community he frequented, regarding Sciortino's "reputation for truth and veracity," and that his reputation in this regard was "poor." Creighton's answers to these inquiries were categorical, covering a page or so of the trial transcript of more than 700 pages. The court, before receiving the testimony, instructed the jury that it was received simply on the issue of Sciortino's credibility, that it had no bearing on the guilt or innocence of Augello or Conigliaro, and that the fact that it was given by an officer did not give it weight. Sciortino argues that the admission of the evidence was error, entitling him to a new trial.

■ A defendant need not testify in his own defense and his failure to do so may not be the basis of any inference against him. But where he chooses, as did Sciortino here, to take the stand, his credibility may be impeached like that of any other witness. Reagan v. United States, 157 U.S. 301, 305, 15 S.Ct. 610, 39 L.Ed. 709 (1895); IIIA Wigmore on Evidence, § 890, pp. 654–56 (Chadbourn rev. 1970). Although evidence of general bad character may not be introduced unless the witness has put his character in issue by offering evidence of his good character, the Government has been allowed to impeach a defendant-witness' credibility by proof of a bad reputation in the community for truth and veracity. See, e. g., Hodge v. United States, 414 F.2d 1040, 1044–1045 (9th Cir. 1969); United States v. Walker, 313 F. 2d 236, 238 (6th Cir.), cert. denied, 374 U.S. 807, 83 S.Ct. 1695, 10 L.Ed.2d 1031 (1963); Hyche v. United States, 135 F. 2d 44 (5th Cir. 1943); McCormick on Evidence, § 44 (1954); IIIA Wigmore on Evidence, § 925, p. 749 (Chadbourn rev. 1970). Such impeachment is usually limited to testimony by a member of the community in which the witness lives, works or spends a substantial portion of his time, regarding the witness' community reputation for truth. V Wigmore on Evidence, § 1616, pp. 488–

89 (Chadbourn rev. 1970). As with evidence of prior convictions offered to impeach the credibility of a defendant who takes the stand in his own defense, the admissibility of this type of impeachment evidence is left to the sound discretion of the trial judge, who must determine whether its probative value is outweighed by its prejudicial effect. See, *e. g.,* United States v. Palumbo, 401 F.2d 270, 273 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969); United States v. Cacchillo, 416 F.2d 231, 234 (2d Cir. 1969); United States v. DiLorenzo, 429 F.2d 216, 220 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1609, 29 L. Ed.2d 120 (1971).

■ The conditions under which evidence of poor reputation for truth and veracity may be offered by the Government to impeach the credibility of a defendant who has taken the stand in his own defense do not appear to have been considered in this Circuit. Accordingly we take this occasion to state that such evidence should be viewed by the trial judge with caution and that except in the rare case where the testimony appears to be well supported, it should be rejected. Being at best in the nature of unsubstantiated community gossip, the probative value of such evidence is doubtful when weighed against the prejudice that it might create in the minds of jurors. See Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates, Rule 608(a) and Note, pp. 74–76 (rev. ed. March 1971).

■ Applying these principles here, the admission of Sgt. Creighton's testimony as to Sciortino's reputation for truth and veracity was erroneous for the reason that Creighton probably was not a member of the communities in which Sciortino lived or worked and it is unclear whether his categorical answer "poor," based on interviews of 12 members of those communities, referred to Sciortino's community reputation or to his reputation with the particular individuals interviewed. However, after reviewing the entire record we are satisfied that the error was harmless. Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Zubkoff, 416 F.2d 141, 144 (2d Cir. 1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 684, 24 L. Ed.2d 682 (1970). No specific prejudice has been shown as the result of the departure from the requirement that community reputation be testified to by a member of the community. Moreover, Creighton's testimony constituted but a minute part of the trial record, and, while that fact might not in some cases indicate absence of serious prejudice, here the court and the parties once it was received appear to have disregarded it entirely. The minor role of the testimony is confirmed by the fact that in the course of rather long summations to the jury no counsel referred to it, nor did the trial judge refer to it in his charge, although they did refer to the testimony of the other witnesses offered by the parties. Accordingly we find that Creighton's testimony did not affect any substantial rights of the parties, 28 U.S.C. § 2111, and that its admission does not constitute reversible error.

■ The remainder of appellants' claims of error are meritless and require little comment. The district court did not abuse its discretion in denying Augello's application for a severance. United States v. Kessler, 449 F.2d 1315 (2d Cir. 1971). Only one conspiracy was alleged and proved. Augello's participation in the conspiracy and his guilt of the substantive count were supported by substantial evidence. Under federal rules of evidence, which govern, Rule 26, F.R.Cr.P., the uncorroborated testimony of an accomplice, while required to be scrutinized with care, was sufficient to support a conviction. United States v. Tyminski, 418 F.2d 1060, 1061 (2d Cir.

1969), cert. denied, 397 U.S. 1075, 90 S. Ct. 1523, 25 L.Ed.2d 810 (1970). Furthermore, although Zizzo was the only witness who gave direct testimony of Augello's participation, Zizzo's testimony was corroborated by circumstantial evidence. Since the Government did not offer any confession or statement of one defendant incriminating another, Burton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), has no application. The district court acted well within its discretion in denying a severance. United States v. Falange, 426 F. 2d 930, 935 (2d Cir.), cert. denied, 400 U.S. 906, 91 S.Ct. 149, 27 L.Ed.2d 144 (1970); United States v. Kahn, 366 F. 2d 259, 263 (2d Cir.), cert. denied, Pacelli v. United States, 385 U.S. 948, 87 S.Ct. 321, 17 L.Ed.2d 226, rehearing denied, Kahn v. United States, 385 U.S. 984, 87 S.Ct. 502, 17 L.Ed.2d 445 (1966). In addition, since Sciortino's statement at the time of his arrest in 1970 to the effect that he had not participated in a hijacking in five years (which would have been at or about the time of the hijacking charged here) was a spontaneous, volunteered admission on his part, it was clearly admissible against him. Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 Finally, it appears that the stolen goods were still in foreign commerce, despite delays en route, since they had not reached their destination. United States v. Concepcion, 419 F.2d 1263, 1264 (2d Cir. 1970); United States v. Thomas, 396 F.2d 310, 315 (2d Cir. 1968); United States v. Maddox, 394 F.2d 297, 300 (4th Cir. 1968). The term "interstate or foreign commerce" as used in 18 U.S.C. § 659 "is not to be hampered by technical legal conceptions." United States v. Berger, 338 F.2d 485, 487 (2d Cir.), cert. denied, 380 U.S. 923, 85 S.Ct. 925, 13 L.Ed.2d 809 (1964).

The judgments of the district court are affirmed.