544 F.2d 156
 UNITED STATES of America, Appellee,
v.
Eric Steven WALSH et al., Appellants.
UNITED STATES of America, Appellee,
v.
Jesse DAVIDSON, Appellant.
UNITED STATES of America, Appellee,
v.
Edward BISHOP, Appellant.
UNITED STATES of America, Appellee,
v.
Louis J. SUMMA, Appellant.
UNITED STATES of America, Appellee,
v.
Nicholas Anthony IACONA, Appellant.
 Nos. 76-1094 to 76-1096, 76-1100 and 76-1101.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 4, 1976.
Decided Oct. 21, 1976.
 
 Peter G. Angelos and H. Russell Smouse, Baltimore, Md., for appellants in 76-1094 and 76-1095.
 Michael S. Frisch, Asst. Federal Public Defender, Baltimore, Md. (Charles G. Bernstein, Federal Public Defender and Gerald M. Richman, Asst. Federal Public Defender, Baltimore, Md., on brief), for appellant in 76-1101.
 Leslie L. Gladstone, Baltimore Md. (court-appointed counsel), for appellant in 76-1100 and for appellant in 76-1096.
 Daniel M. Clements, Asst. U.S. Atty., Baltimore, Md. (Jervis S. Finney, U.S. Atty., Gerard P. Martin, Asst. U.S. Atty., Baltimore, Md., on brief), for appellee in 76-1094, 76-1095, 76-1096, 76-1100 and 76-1101.
 Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and WYZANSKI, Senior District Judge.*
 FIELD, Senior Circuit Judge:
 
 
 1
 A Runyonesque gambit at the Bowie Race Track on February 14, 1975, resulted in a very peculiar horse race and a thirteen count indictment by a federal grand jury. Subsequently, the appellants, Walsh,[1] Gino, Feliciano and Davidson, all of whom were jockeys at Bowie, were convicted by a jury in the District Court of Maryland of conspiracy to commit sports bribery in violation of 18 U.S.C. §§ 224 and 371 (Count One); interstate transportation in aid of racketeering in violation of 18 U.S.C. § 1952(a)(1) (Counts Five and Six); conspiracy to make fraudulent representations to the Internal Revenue Service in violation of 18 U.S.C. § 371 and 26 U.S.C. § 7206(2) (Count Seven); and fraud by wire in violation of 18 U.S.C. § 1343 (Counts Eight, Nine and Ten). The appellants, Iacona, Summa and Bishop, who were not jockeys but apparently followers of the sport of kings, were also found guilty of the conspiracy in Count Seven of the indictment.
 
 
 2
 The evidence presented by the Government established the following facts. The four jockey appellants devised a plan to successfully "box" the "Triple" ("Trifecta") in the ninth race on the day in question. To win the Triple a bettor is required to choose the three horses finishing first, second and third in that race. The standard Triple ticket, unlike other wagers at the track, costs three dollars. However, for the convenience of patrons the track permits the purchase of a "box" ticket on the Triple at a cost of eighteen dollars which covers the selected three horses regardless of the order of finish. Since a "box" ticket contains all six possible combinations of finish for any three given horses, it necessarily includes only one winning three dollar wager and five losing three dollar wagers.
 
 
 3
 The jockeys decided to bend their efforts to bring about a winning combination of "2-8-12", and garnered enough money to purchase thirty-eight "box" tickets on that combination. Having purchased the tickets, the jockeys rode their mounts in the race and the order of finish was "8-12-2". Accordingly, the jockeys owned thirty-eight of the sixty-two winning eighteen dollar tickets in the betting pool for the Triple. One of the track supervisors noticed that the ratio of winning eighteen dollar tickets was three to one over the number of winning three dollar tickets, and it occurred to him that this was rather strange since the normal ratio was approximately fifty-fifty. The fact that thirty-nine out of the total of sixty-two winning eighteen dollar tickets had been purchased at one window in the clubhouse aroused further suspicions. This circumstance was compounded by the observation of the track stewards who were impressed by the highly irregular manner in which some of the jockeys handled their mounts during the race. A review of the track films confirmed the stewards' belief that something was amiss, and an investigation of the race was initiated.
 
 
 4
 Meanwhile the jockeys were attempting to realize the profits from their winning tickets which presented a greater problem than they had anticipated. Luigi Gino sought the assistance of one Heddy Sue May who made an unsuccessful attempt to cash two of his tickets. She testified that Gino informed her that "two guys from Pennsylvania" would be coming in to cash the tickets. The services of these "ten-percenters"[2] were procured by William Vuotto, an agent of jockey Walsh, who testified that he called the appellant Eddie Bishop from his home in Maryland. He further testified that Bishop who lived in Delaware advised him that he had obtained some individuals to cash the tickets. Iacona and Summa, whose services had been enlisted by Bishop, attempted to redeem the tickets on February 19, 1975, but were unsuccessful. When Iacona attempted to cash the tickets, he told the track officials that he and Summa had pooled their money and purchased the tickets for the, now, infamous ninth race. Frustrated in their attempt to cash the tickets, Iacona and Summa left the ticket windows and were followed by a track detective who observed that their automobile carried a Pennsylvania license tag and obtained the number. The tickets were returned to Bishop, who gave them to Walsh, and Bishop testified that on the following day, February 20th, Walsh told him that the tickets had been destroyed and that he should forget about the entire transaction.
 
 
 5
 * The threshold issue on this appeal is whether 18 U.S.C. § 224 applies to a conspiracy among the contestants as opposed to one involving individuals who are not contestants and attempt to bribe those actually involved in the sport. We find nothing in the express language of the statute to indicate that it was intended to apply only to bribery on the part of those who are not participating in the contest. The statute provides, in part:
 
 
 6
 "Whoever carries into effect, attempts to carry into effect, or conspires with any other person to carry into effect any scheme in commerce to influence, in any way, by bribery any sporting contest * * *." (Emphasis added).
 
 
 7
 The statutory language does not purport to limit its application, and "(w) here the power of Congress is clear, and the language of exercise is broad, we perceive no duty to construe a statute narrowly." United States v. Erdos, 474 F.2d 157, 160 (4th Cir.), cert. denied, 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973). It occurs to us that a plain reading of the statute indicates that it is designed to encompass bribery schemes originated by participants in a sporting contest as well as those initiated by "outsiders".
 
 
 8
 While we recognize that the primary purpose of the legislation was to assist the "Federal Government in the assault on organized crime," the Legislative History supports the proposition that Section 224 was intended to "include players and officials as well as gamblers and fixers."[3] The Legislative History further indicates that the Congress was of the opinion that the infiltration of sports by organized gambling could be materially inhibited "by punishing any players or officials as well as gamblers who attempt to corrupt * * * for personal gain."[4] Finally, we note that Section 224 was enacted to remedy the inability of prosecutors to utilize 18 U.S.C. § 1952 to effectively deal with the problem of sports bribery.[5] In Section 1952, the Travel Act, the term "unlawful activity", includes, in part, "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." Judicial interpretation of the Travel Act has recognized that "Congress did not choose to direct the prohibitions of section 1952 against only those persons who could be shown to be members of an organized criminal group * * *." United States v. Roselli, 432 F.2d 879, 885 (9 Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828, reh. denied, 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665 (1971) (footnote omitted). See United States v. Peskin, 527 F.2d 71, 76-77 (7 Cir. 1975). Similarly, we conclude that Section 224 was designed to cover a greater range of offenders than those involved in organized crime, and since the statute specifically includes "players", it would be unreasonable to limit its application to non-contestants.
 
 
 9
 The further argument of the appellants that horse racing is not a " sporting contest" within the meaning of Section 224(c)(2) is utterly without merit. History, logic and common sense reject such an argument, and the further contention that horse racing does not fall within the statute because it is a competition between horses and not individual contestants is equally specious. If a decisional answer to such an argument is required, it may be found in United States v. Pinto, 503 F.2d 718, 724 (2 Cir. 1974), where the court stated that the argument:
 
 
 10
 "rests on the surprising assertion that a harness race is not a 'sporting contest' within the meaning of 18 U.S.C. § 224(c)(2) since it involves animals rather than 'individual contestants.' However, the word 'individual' when used as an adjective does not necessary (sic) pertain to humans only, see Webster's Third New International Dictionary 1152, and the legislative history manifests a Congressional intent to prohibit bribery of any person who can influence sports results. See H.Rep. 1053, 2 U.S.Code Cong. & Admin.News p. 2250 (1964). Furthermore, the drivers who are undeniably 'individuals', are an essential part of the contest, which frequently turns on their respective skills." (Emphasis by the court).
 
 II
 
 11
 Iacona, Summa and Bishop seek reversal of their convictions on the conspiracy charge, contending that the district court improperly denied their motion for a severance from the other defendants. The rule of long standing in this circuit is that
 
 
 12
 "the question of severance or common trial is vested under Rule 14 in the sound discretion of the trial judge and his decision will be reversed on appeal only upon a clear abuse of that discretion."
 
 
 13
 Cataneo v. United States, 167 F.2d 820, 823 (4th Cir. 1948). See United States v. Boswell, 372 F.2d 781, 784 (4 Cir.), cert. denied, 387 U.S. 919, 87 S.Ct. 2033, 18 L.Ed.2d 972 (1967); United States v. Miller, 340 F.2d 421, 423 (4 Cir. 1965). We have further held that denial of a motion for severance will not be deemed reversible unless an appellant demonstrates that it resulted in a degree of prejudice so substantial "that the defendants did not receive a fair trial, that 'a miscarriage of justice' has occurred." United States v. Frazier, 394 F.2d 258, 260 (4 Cir.), cert. denied, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968).
 
 
 14
 These appellants contend, however, that the evidence demonstrated the existence of two separate and distinct conspiracies and suggest that this case falls within the rationale of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Their reliance upon that case is misplaced since we are dealing here with a "chain" conspiracy rather than a "wheel" conspiracy which was the subject of Kotteakos. In United States v. Cobb, 446 F.2d 1174 (2 Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 451, 30 L.Ed.2d 369 (1971), the court was confronted with a conspiracy somewhat similar to that in the present case. In distinguishing Kotteakos, the Second Circuit held that "(i)n contrast, the defendants' conspiracy herein had as its object a 'single unified purpose' or 'common end,' i. e., the cashing of winning tickets while concealing from the Government the identity of the true recipient." 446 F.2d at 1177. Under the circumstances, the action of the trial court in denying the motion for severance was not an abuse of discretion.
 
 III
 
 15
 In addition to the severance issue, Iacona, Summa and Bishop join the jockey appellants in urging upon us that the evidence was insufficient to warrant their convictions under Count Seven of a conspiracy to violate 26 U.S.C. § 7206(2), and they suggest, among other things, that there is no evidence indicating that the jockeys had knowledge of the Internal Revenue Service requirement. To accept this argument would require a degree of naivete on our part which we are unwilling to concede.
 
 
 16
 The Daily Racing Program at Bowie carried an explicit statement of the circumstances under which the actual owner was to be identified when presenting a winning ticket,[6] and the jury could fairly infer that the jockeys as well as habitues of the track were aware of the tax law requirements. Scienter on the part of Iacona and Summa was evidenced by their false statement to the track officials that they had purchased the tickets with their own money. The prosecution of "ten-percenters" under such circumstances for violation of Section 7206(2) is not uncommon. See United States v. Lincoln, 472 F.2d 1183 (5 Cir. 1973); United States v. Kessler, 449 F.2d 1315 (2 Cir. 1971). Similarly, the conviction of those procuring the services of such "ten-percenters" to cash their winning tickets has been upheld. See United States v. Dumaine, 493 F.2d 1257 (1 Cir. 1974).
 
 
 17
 There is ample support in the record for the conclusion that the jockeys knew that the law required disclosure of their ownership of the tickets, and it was for this reason that they sought the services of Bishop, Iacona and Summa. The fact that their primary purpose was to conceal that the race had been fixed is of no moment. It is sufficient that as a part of the scheme they also conspired to make the false and fraudulent representations to the Internal Revenue Service. It is well settled that a single conspiracy may have a multiplicity of objectives, "and if one of its objectives, even a minor one, be the evasion of federal taxes, the offense is made out, though the primary objective may be the concealment of another crime." Ingram v. United States, 360 U.S. 672, 679-80, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503 (1958), reh. denied, 361 U.S. 856, 80 S.Ct. 42, 4 L.Ed.2d 96 (1959). As to the non-jockey appellants, they well knew that they were being retained to falsely represent to both the track officials and the Internal Revenue Service that they, rather than the jockeys, were the owners of the winning tickets and this was sufficient to bring them within the range of the conspiracy for which they were convicted.
 
 IV
 
 18
 The jockey appellants also contend that the evidence was insufficient to establish their guilt of either bribery or conspiracy to commit bribery. Bearing in mind "that the verdict of the jury must be sustained 'if there is substantial evidence, taking the view most favorable to the government, to support the findings of guilt.' " United States v. Holt, 529 F.2d 981, 984 (4 Cir. 1975), we find in the record a sound basis for the convictions.
 
 
 19
 We will not indulge in a minute review of the testimony relative to the manner in which the jockeys manipulated their mounts during the course of the race. Suffice it to say that the evidence, including the official race films, presented a picture of misconduct that at times bordered on the bizarre. Additionally, Carlos Albert Jimenez, one of the jockeys who rode in the ninth race, testified that prior to the race he was approached by Feliciano who asked him to "pull" his horse. Jimenez replied "O.K." and Feliciano told him that it would cost $150.00. Later Jimenez approached Gino, stating "My money is in, and I don't know what happened," whereupon Gino cryptically replied "2-8-12". Jimenez testified that this information was sufficient for him. Jimenez further testified that Jesse Davidson met with him and Gino after the race at which time Davidson gave Jimenez five of the winning tickets. Jimenez cashed two of these tickets but later returned three of them to Walsh at the latter's request.
 
 
 20
 In our opinion the offer of the appellants to include Jimenez in the betting pool in exchange for his agreement to "pull" his horse was sufficient to support the charge of bribery, and the evidence in its entirety supported the convictions on the conspiracy count.
 
 
 21
 We have given careful consideration to the other assignments of error, including the challenges of the Travel Act and wire fraud counts, and find no error. Accordingly, the convictions are affirmed.
 
 
 22
 AFFIRMED.
 
 
 
 *
 Honorable Charles Edward Wyzanski, Jr., Senior District Judge, District of Massachusetts, by designation
 
 
 [1]
 Eric Stephen Walsh died while this appeal was pending and an order was entered abating the judgment of his conviction and dismissing the indictment against him. However, for the purposes of clarity and continuity, he will be referred to in this opinion as one of the appellants
 
 
 [2]
 A "ten-percenter" is one who, for a fee amounting to ten percent of the winnings, cashes tickets for others and completes the required Internal Revenue Service form. See United States v. Lincoln, 472 F.2d 1183 (5 Cir. 1973)
 
 
 [3]
 109 Cong.Rec. 4107 (1963) (remarks of Congressman Lindsay)
 
 
 [4]
 109 Cong.Rec. 2016 (1963) (remarks of Senator Keating). See 110 Cong.Rec. 920 (1964) (remarks of Congressman Corman); 110 Cong.Rec. 921-22 (1964) (remarks of Congressman McCulloch)
 
 
 [5]
 110 Cong.Rec. 921 (1964) (remarks of Congressman McCulloch)
 
 
 [6]
 The Bowie program of February 24, 1975, carried a notice reading as follows:
 Before receiving payment of $600 or more for a $2 wager, or $900 or more for a $3 wager, a person presenting a winning ticket (payee) must provide proper identification. The required identification must be the name, address, Social Security number of the actual winner, that is the person owning the winning ticket. The identity of the actual winner is furnished to the Internal Revenue Service for determination of income tax liability. It is a violation of Federal law to furnish false information or to aid or assist another in furnishing false information.
 District Director, Internal Revenue Service.