UNITED STATES of America, Plaintiff-Appellee,

v.

Raymond WATSON, Herbert L. Williams, Walter Arthur Parker, William Harrison King, Michael D. Berry, a/k/a "Jerry Forsh" and J. B. McGlocklin, Defendants-Appellants.

No. 80–5613.

United States Court of Appeals, Eleventh Circuit.

March 8, 1982.

Before FAY, ANDERSON and CLARK, Circuit Judges.

FAY, Circuit Judge:

Appellants Watson, Williams, Parker, King, Berry, and McGlocklin were each charged under a one count indictment with conspiracy to possess marijuana with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846.[1] On July 10, 1980, a jury found all six guilty. Among the numerous issues presented on appeal, we find that one, the exclusion of opinion witnesses offered by the defense to impeach the government's key witness, requires reversal.

## THE FACTS

The evidence presented by the government consisted primarily of testimony by Patrick Campbell. Campbell related two major incidents which occurred during the course of the conspiracy. The first incident involved Campbell's introduction to the conspiracy at an airport in north Florida. The second incident entailed the planning and carrying out of a trip to Colombia, South America, for the purpose of importing marijuana. What follows is a review of the evidence presented at trial, considered in the light most favorable to the government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

*The Tri-County Airport*

The Tri-County Airport is located in Holmes County, Florida—a rural area in the panhandle. Patrick Campbell and his wife lived in a trailer at the airstrip in April, 1979. On the evening of April 8, 1979, appellants Bill King, J. B. McGlocklin, and Mike Berry appeared at the Campbell's trailer. King told Campbell that a load of

Vincent J. Flynn, Miami, Fla., for Watson.

Roger D. Patterson, Panama City Beach, Fla., for Williams.

James K. Jenkins, Atlanta, Ga., Gerald H. Goldstein, San Antonio, Tex., for Parker.

Owen N. Powell, Bonifay, Fla., for King & Berry.

Bonnie K. Roberts, Bonifay, Fla., for McGlocklin.

David L. McGee, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

1. Four other persons, William Pitts, Earl Johnson, Dirk Winky, and "Jim", were named in the indictment but were not tried with appellants.

marijuana was being flown into the airport that night and offered him $5,000 to keep silent. Pursuant to an agreement with Agent Rowell, of the Florida Department of Law Enforcement, Campbell informed King that he was a pilot and offered to help in future ventures. King said that he would "contact the people down south" to see if Campbell could act as pilot on future trips.

About the end of June, 1979, the Campbells vacated the trailer and Phil Robbins, who was also working with Agent Rowell, moved in. Appellants King and Berry came to the trailer looking for Campbell on August 8th. They asked Robbins where Campbell was and after a short conversation Robbins offered to help the smugglers. King then told Robbins that there were plans to bring about five loads of marijuana into the Tri-County Airport and he offered Robbins $5,000 each trip for his cooperation. King said that his responsibility in the "organization" was to provide protection at the airstrips and to see to the unloading and delivery of the marijuana.

*The Colombian Trip*

In mid-August, 1979, King, Robbins, and Campbell met at a convenience store in Wausau, Florida. King asked Campbell if he would be interested in flying marijuana into the country. Campbell agreed. A few days later, King purchased a ticket to West Palm Beach and sent Campbell there to meet Ray Watson. Watson picked Campbell up at the West Palm Beach Airport on August 15th or 16th. They drove to Fort Lauderdale to check on the airplane which would be used to transport the marijuana and then they returned to West Palm Beach.

In West Palm Beach, Campbell attended a meeting which included Ray Watson, Walter Parker, and William Pitts. At the meeting Campbell was told that the marijuana would be picked up in Colombia, flown to the California coast where a water drop would be made of three or four thousand pounds, and then the rest of the load would be flown to the Tri-County Airport and distributed from there. After the meeting, Campbell and Watson drove to a convenience store where Watson made a phone call to Colombia and told his brother, Herb Williams, to get the marijuana ready to load up.

A couple of days after the West Palm Beach meeting, Campbell, Parker, and Dirk Winky flew out of Lakeland, Florida to Port-au-Prince, Haiti. The trio spent the night at Parker's house in Haiti. The next day, Parker, Campbell, Dirk Winky, and "Jim" flew to Colombia. They landed on an airstrip adjacent to a river. But it was the wrong airstrip and, to make matters worse, the plane was stuck in mud. Dirk Winky went upriver and returned with Herb Williams and a few other people. While all hands were attempting to free the plane, a Colombian airplane appeared and began circling. The group jumped into motorized canoes and proceeded upriver to a farmer's shack. From their vantage point at the shack they observed the Colombian aircraft dropping bombs in the vicinity of the stranded plane. Herb Williams left the group at the shack, but all five met up later that evening at the airstrip where the plane should have landed. From that airstrip, Campbell, Jim, Dirk Winky, and Parker went further upriver to the spot where the marijuana was stored. They stayed at that site for three days.

Then commenced the return trip. The route back took the group to Bogota, an airstrip on the Colombian coast, Port-au-Prince, and Nassau—with mishaps occurring at every turn. Campbell, accompanied by the McCoys (friends of Parker), finally arrived back in the United States on August 29, 1979. He was picked up at the West Palm Beach Airport by Herb Williams.

Sometime after the August fiasco, Campbell, King, Watson, and McGlocklin waited on a planeload of marijuana at Watson's house in Okeechobee, Florida. After a few hours, Watson announced that the plane

had been stolen by its pilot, no "dope" was coming in, and everyone should go home. At the last meeting Campbell had with King, in December, 1979, King indicated that he feared they were all going to jail because the "people down south had their telephone records subpoenaed."

## THE ISSUES

Although we find that the District Court's exclusion of witnesses who would give their opinion of Patrick Campbell's ability to testify truthfully requires reversal, we will also address all other issues presented by the appellants. Guidance at this point, we believe, will serve as an aid to proceedings on retrial.

The issues roughly fall into three categories: the sufficiency of the government's proof; the exclusion of character witnesses and other evidentiary matters; and matters occurring at the end of trial.

*Sufficiency of the Government's Proof*

Two issues concern the sufficiency of the evidence. All appellants argue that the government charged one, but proved two conspiracies. Appellant Williams also challenges the sufficiency of the evidence to support his conviction.

Appellants argue that the District Court's denial of their severance motions was improper because the government presented proof at trial of two conspiracies when the indictment charged a single conspiracy to possess with intent to distribute marijuana.[2]

They maintain that the first conspiracy centered around the April incident at the Tri-County Airport while the second conspiracy involved the aborted smuggling trip to Colombia, that the government failed to prove any connection between the two incidents, and that the government failed to prove that either group of participants was aware of the activities of the other group.

When a conspiracy is charged under 21 U.S.C. § 846, the government must prove, by direct or circumstantial evidence, that there was an agreement among the defendants to achieve an illegal purpose. *United States v. Michel*, 588 F.2d 986, 994 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Gordon*, 580 F.2d 827, 834 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978). The existence of the conspiracy must be proved beyond a reasonable doubt, *Michel*, 588 F.2d at 994; but the government is not required to prove that each conspirator was aware of all other conspirators, or that each conspirator participated at every stage of the conspiracy. *United States v. Becker*, 569 F.2d 951, 960 (5th Cir. 1978), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1979); *United States v. Morrow*, 537 F.2d 120, 130 (5th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). The factors we examine to determine whether there is one over-

---

**2.** Appellants base their severance arguments on alternate theories. Parker, Watson, and Williams contend that a material variance was created between the indictment and the proof at trial. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). King, Berry, and McGlocklin argue misjoinder under Rule 8(b), Federal Rules of Criminal Procedure. A separate analytical approach is required for each theory. *See United States v. Sutherland*, 656 F.2d 1181, 1190 n.6 (5th Cir. 1981); *United States v. Levine*, 546 F.2d 658, 662–63 (5th Cir. 1978). Our finding that the government charged and proved a single conspiracy renders unnecessary a delineation of the intricacies of either theory.

Appellants King, Berry, and McGlocklin also claim the District Court erred in denying their motion for a bill of particulars. Whether to grant a motion for a bill of particulars is within the trial court's discretion. Denial of the motion "will be overturned only upon a showing of clear abuse of discretion evidenced by actual surprise or other prejudice." *United States v. Cuesta*, 597 F.2d 903, 920 (5th Cir. 1979). Appellants have made no such showing. We therefore do not find that the District Court's denial of appellants' motion was an abuse of discretion.

all conspiracy are "the existence of a common goal, the nature of the scheme, and an overlapping of participants in the various dealings." *Becker*, 569 F.2d at 960.

■ The government presented substantial evidence in this case to support the jury's verdict of a single conspiracy. The common goal of the conspiracy was the importation and distribution of marijuana into this country. The nature of the scheme, involving as it did the unloading of marijuana off planes at the Tri-County Airport and flights to Colombia to pick up the marijuana, renders it inconceivable that the appellants were unaware of the participation of others in the conspiracy. Finally, there was proof of overlapping membership; King, McGlocklin, and Berry were together at the Tri-County Airport, Watson and Parker met with Campbell to plan the Colombia flight, and King, Watson, and McGlocklin waited together on another planeload of marijuana. That some of the defendants were responsible for smuggling the marijuana out of Colombia and others were responsible for offloading and distribution at the Tri-County Airport makes no difference. The government's evidence established that they were working together "with a single design for the accomplishment of a common purpose." *United States v. Johnson*, 585 F.2d 119, 128 (5th Cir. 1978). We conclude that appellants' motions for severance were properly denied by the District Court.

Appellant Williams claims that the evidence is insufficient to support his conviction because the government proved no more than his presence and association with conspirators.

■ On appeal, we must determine whether, taking the view most favorable to the government, *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469, the evidence could be found to exclude every reasonable hypothesis of innocence. *United States v. Berry*, 644 F.2d 1034, 1039 (5th Cir. 1981); *United States v. Marable*, 574 F.2d 224, 229 (5th Cir. 1978).

To establish individual guilt in the context of a conspiracy charge, the government must prove that the defendant knew of the conspiracy and voluntarily participated in it. *United States v. Middlebrooks*, 618 F.2d 273, 278 (5th Cir.), *modified on other grounds*, 624 F.2d 36 (5th Cir.), *cert. denied*, 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980); *United States v. Harbin*, 601 F.2d 773, 781 (5th Cir. 1979). Mere association with other conspirators, or presence at the scene of the crime, without more, is insufficient to prove knowing participation in the conspiracy. *United States v. Littrell*, 574 F.2d 828, 833 (5th Cir. 1978). But participation in the conspiracy may be demonstrated by circumstantial evidence and the jury may draw inferences that are supported by proof. *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981). *See United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980) (*en banc*), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

The government presented evidence that Watson made a phone call to Colombia and told Williams to get the marijuana ready to load up. A few days after that conversation, Williams came to the aid of the other conspirators when their plane landed at the wrong airstrip in Colombia. He assisted them in trying to remove the plane and, after they abandoned their efforts, he travelled upriver with the group to a farmer's shack. He then left the group and met up with them later at the airstrip where the plane should have landed. Finally, Williams picked Campbell up at the West Palm Beach Airport upon Campbell's return to the United States.

■ Williams postulates as an innocent motive for his activities that he might have been "boondock stomping" in Colombia. The evidence, however, supports a finding that Williams was not taking a stroll in the jungle. The jury could reasonably infer, from the phone conversation and Williams' subsequent appearances and assistance at

the Colombia airstrips, that Williams agreed to have the marijuana ready to load when the plane landed and that his presence at the airstrips was for that purpose. It was for the jury to decide whether such activity was a part of the conspiratorial effort or an innocent sojourn. The evidence supports the conclusion that Williams was a knowing and voluntary participant in the conspiracy.

*The Exclusion of Character Witnesses*

Six impeachment witnesses were offered by appellants to give testimony regarding Patrick Campbell's character for truthfulness. During voir dire examination the prosecutor inquired into the extent of each witness' familiarity with the community and with Campbell. The government's attorney then objected to each of the witnesses on the ground that an adequate foundation of familiarity had not been laid. The District Court ruled that five were excludable on that ground. Appellants chose not to put the sixth witness, Campbell's father, on the stand because they believed the father's testimony against his son, standing alone, would hurt more than it would help.

The issue on appeal is whether the trial court's exclusion of the five character witnesses was prejudicial error. One of the excluded witnesses was offered solely to give reputation testimony. The rest would have given opinion testimony or a combination of opinion and reputation testimony.[3]

Rule 608, Federal Rules of Evidence, governs the use of character evidence to attack credibility. The rule provides: "The credibility of a witness may be attacked or supported by evidence in the form of *opinion* or *reputation ...*." Fed.R.Evid. 608(a) (emphasis supplied).

■ We deal with the reputation witness first. A proper foundation must be laid before the admission of reputation testimony. The reputation witness must be qualified through a showing of "such acquaintance with the [person under attack], the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." *Michelson v. United States,* 335 U.S. 469, 478, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948). *See also United States v. Augello,* 452 F.2d 1135, 1139–40 (2d Cir. 1971), *cert. denied,* 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972); *United States v. Salazar,* 425 F.2d 1284, 1286 (9th Cir. 1970). Appellants' reputation witness testified that she had lived in Bonifay (the location of the Tri-County Airport) for thirty-three years; she worked with Campbell every day from July, 1978 to October, 1978; she talked with customers about Campbell; and his reputation for truthfulness at that time was bad.

■■ A trial court's determination that the foundation of a reputation witness is inadequate will ordinarily not be overturned on appeal. *See Michelson,* 335 U.S. at 480–81, 69 S.Ct. at 220–221; *Augello,* 452 F.2d at 1140. In the present case, the witness' testimony indicated that she not only knew Campbell for a short period of time,[4] but also that her testimony was to a reputation that existed at a time remote from both the time of the conspiracy and the

---

3. The parties differ regarding which witnesses were reputation witnesses and which ones were opinion witnesses. The government asserts that witnesses Marquette and Kyle were the only witnesses offered to give opinion testimony. Appellants claim that all but witness Messer were offered to give opinion testimony. We have reviewed the testimony of each witness and conclude that witness Messer was offered to give reputation testimony and witnesses Kyle, Price, and Ellis were offered as

opinion witnesses. Although the status of Marquette, from the record, is equivocal, we are willing to accept the government's assessment of this individual as an opinion witness.

4. We note the Eighth Circuit has demonstrated a willingness to allow reputation testimony that is based on a short period of acquaintance. *United States v. Oliver,* 492 F.2d 943 (8th Cir. 1974).

time of trial.[5] The District Court's ruling regarding this witness was within the bounds of its discretion. Were Rachel Messer the only character witness offered by appellants we would not reverse.

The District Court's exclusion of the opinion witnesses is the most troubling issue in this case. The inclusion of opinion testimony in Rule 608(a) represents a deviation from common law practice. *See* 3 Weinstein's Evidence ¶ 608[04] (1981). Whether a foundation such as that required for reputation testimony is also required for opinion testimony was decided by the Fifth Circuit in *United States v. Lollar*, 606 F.2d 587 (5th Cir. 1979). In *Lollar*, the defendant argued that the district court erred when it permitted a government witness to give an opinion of the defendant's character for truthfulness. The Fifth Circuit determined that prior questioning of the opinion witness regarding his knowledge of the defendant's reputation was unnecessary. "The rule imposes no prerequisite conditioned upon long acquaintance or recent information about the witness; cross-examination can be expected to expose defects of lack of familiarity and to reveal reliance on isolated or irrelevant instances of misconduct or the existence of feelings of personal hostility towards the principal witness." *Id.* at 589 (quoting 3 Weinstein's Evidence ¶ 608[04], at 608–20 (1978)).

 That opinion testimony does not require the foundation of reputation testimo-

ny follows from an analysis of the nature of the evidence involved. The reputation witness must have sufficient acquaintance with the principal witness and his community in order to ensure that the testimony adequately reflects the community's assessment. *Michelson*, 335 U.S. at 478, 69 S.Ct. at 219. In contrast, opinion testimony is a personal assessment of character. The opinion witness is not relating community feelings, the testimony is solely the impeachment witness' own impression of an individual's character for truthfulness. Hence, a foundation of long acquaintance is not required for opinion testimony. Of course, the opinion witness must testify from personal knowledge. *See* Fed.R.Evid. 602. But once that basis is established the witness should be allowed to state his opinion, "cross-examination can be expected to expose defects." 3 Weinstein's Evidence ¶ 608[04], at 608–20 (1981).

 The record reveals that the opinion witnesses offered by appellants had formed an opinion based on personal knowledge.[6] Consequently, we find that the District Court's exclusion of their testimony for failure to meet a foundation requirement was error. We recognize that trial courts, in the exercise of their discretion, may limit the number of character witnesses a party may call and, absent an abuse of discretion, the district court's ruling will not be disturbed on appeal. *United States v. Haynes*, 554 F.2d 231, 234 (5th Cir. 1977);

---

5. Evidence of community reputation for truth and veracity should relate to reputation at the time of trial. 3 Weinstein's Evidence ¶ 608[03], at 608–17 (1981).

6. On voir dire examination the following was elicited from the witnesses:

(1) John Marquette testified that he had lived near the Tri-County Airport for six years, that he had worked with Patrick Campbell on two or three occasions for less than an hour on each occasion, that he had talked with three to five people in the community about Campbell, and that in his opinion Campbell was not a truthful person and that Campbell had a reputation in the community for being untruthful.

(2) Dean Kyle testified that he had employed Campbell for approximately three months and that he had a bad opinion of Campbell's character for truthfulness.

(3) Carlo Price testified that he was a supervisor at Sowell Aircraft in Panama City, that Campbell had been employed by Sowell Aircraft for about two weeks, that he had observed Campbell during that time, and that in his opinion Campbell had made untrue statements regarding his skills as a mechanic.

(4) Denny Ellis testified that he was an employee of the Florida Department of Agriculture, that Campbell had made a false complaint against a crop duster, and that in his opinion Campbell was not worthy of belief under oath.

*United States v. Gray*, 507 F.2d 1013, 1016 (5th Cir. 1975). But this case does not involve such an exercise of discretion. The four opinion witnesses were excluded because the District Court was mistaken regarding the necessity of a foundation for opinion testimony. *See United States v. Oliver*, 492 F.2d 943, 947 (8th Cir. 1974).[7] Moreover, the District Court's error denied appellants their sixth amendment right to compulsory process. *United States v. Davis*, 639 F.2d 239, 244 (5th Cir. 1981); *United States v. Goodwin*, 625 F.2d 693, 700 (5th Cir. 1980). The Supreme Court has termed this right "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Constitutional error such as this mandates reversal unless we are convinced that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ *United States v. Davis* is instructive on this point. The prosecution, in *Davis*, relied heavily on the testimony of an informant. The defense called two character witnesses to impeach the informant's credibility, but they were disallowed by the trial court as a discovery sanction and under Rule 403, Federal Rules of Evidence. The Fifth Circuit found that the district court erred in excluding the witnesses and, as a result of the error, the defendants' right to compulsory process was infringed. It was not possible to find the error harmless beyond a reasonable doubt when "the role of the government's witness [was] so

central and the jury's perception of his credibility so crucial to conviction." 639 F.2d at 245. Campbell occupied a similar position. He was the lynchpin to the government's case. His testimony was the only testimony to link all the appellants in a single conspiracy and it was the only direct evidence of the flight to Colombia. Campbell's credibility was critical to the government's case. The excluded "testimony would certainly be essential to a jury's decision whether to believe [Campbell's] testimony, without which the government would have no case." *Id.* Under these circumstances we are unwilling to speculate whether the excluded evidence would have affected the jury's verdict. We hold that the exclusion of the opinion witnesses was not harmless beyond a reasonable doubt and therefore conclude that we must reverse and remand for retrial.

■ Two other evidentiary matters must be discussed. Appellant Watson challenges the denial of his motion to suppress. When Watson was arrested the police officers searched his person and removed his wallet which they placed on a table. One of the officers testified that he left the room momentarily with Watson's girlfriend. When he returned he saw another officer remove the wallet from a cabinet drawer and advise Watson that the wallet had been seized as evidence. Several items, including an address book, receipts, and a piece of paper containing names, were taken from the wallet and placed in a plastic evidence bag. Watson claims that a warrant was required to search the wallet because the

7. The government acknowledges that the predicate required for reputation testimony is not required for opinion testimony. It is of no assistance to the trial judge to acknowledge in an appellate brief the difference between opinion and reputation testimony. Our review of the record indicates that counsel for the government provided absolutely no help to the trial court. Instead, the government now urges that, although the District Court technically erred by requiring a predicate, the foundation of the witnesses was so "distressingly weak" that the court could have excluded the witness-

es under Rule 403, Federal Rules of Evidence, because the prejudicial impact of their testimony outweighed its slight probativeness. The record reflects that the District Court's ruling was not an exercise of discretion under Rule 403 and if that were the basis of the District Court's ruling, under our analysis, *infra*, reversal would still be mandated. We find no overriding prejudice in the witnesses' "weak foundation." The merit of their testimony was for the jury to evaluate. *See generally United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976).

wallet was under the exclusive control of the officers. We cannot agree. The wallet was taken from Watson's person during a search incident to arrest. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The seizure of documents found within the wallet was within the proper scope of the search. *See United States v. Setzer*, 654 F.2d 354, 359 (5th Cir. 1981); *United States v. Castro*, 596 F.2d 674, 677 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

■ King, Berry and McGlocklin claim that the District Court erred when it failed to exclude from evidence fuel receipts and ledger entries as a discovery sanction against the government. Discovery matters are ordinarily committed to the sound discretion of the trial court. *Ginsberg v. United States*, 257 F.2d 950, 956 (5th Cir. 1958). A discovery ruling will not be reversed on appeal unless it is shown that the trial court exceeded its discretion and that the error prejudiced the substantial rights of the party seeking reversal. *United States v. Bullock*, 551 F.2d 1377, 1384 (5th Cir. 1977); *United States v. Saitta*, 443 F.2d 830, 831 (5th Cir.), *cert. denied*, 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 250 (1971).

At trial the government called Sue Foran, owner of a flight fuel station, who testified that large quantities of fuel were purchased from her station by a man resembling Mike Berry. She produced three fuel receipts and a ledger. Appellants objected to the introduction of the documents into evidence because they had not been disclosed in discovery.[8] The trial judge ruled that discovery had been made and overruled the objection. The record reflects that the government's amended response to defendants' request for discovery, filed three days before trial, lists the fuel receipts and certifies that a copy of the amended response was furnished by hand delivery to all appellants. The ledger was not listed. The trial transcript also reflects that one defense attorney (although not the one representing these three appellants) was orally notified of the government's intended use of the documents.

■ Although the discovery made by the government was on short notice and was not as complete as it could have been, the District Court's ruling that the government had made disclosure is supported by the record. We do not believe that allowing the documents into evidence was an abuse of discretion. Nor do we find that appellants were prejudiced by the introduction of the documents. The documents were merely corroborative of Sue Foran's testimony, added little to the government's case, and their introduction fell short of affecting appellants' substantial rights.

### The End of Trial

The remaining issues can best be addressed by setting forth briefly the sequence in which they arose.

Prior to closing arguments the trial judge held a charge conference. At the conference appellants were informed that the jury instructions would be tape recorded and a copy sent with the jurors into the jury room. An objection was made to this procedure. Near the close of the conference a request was made under Rule 30, Federal Rules of Criminal Procedure, that after the charge, the jury be excused in order to give appellants an opportunity to make objections out of the presence of the jury. After the jury was charged, however, appellants

---

**8.** Rule 16(a)(1)(C), Federal Rules of Criminal Procedure, provides:

*Documents and Tangible Objects.*
Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, build-ings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

were required to make their objections at the bench in the presence of the jury. Thirty-five minutes after the jury retired, the trial judge realized that an alternate juror had retired with the jury. The jury was called back and the alternate was immediately discharged.

The tape recorded charge, the Rule 30 violation, and the failure to discharge the alternate before the jury retired are cited on appeal as instances of reversible error. We believe that these problems and, indeed, our reversal predicated on the exclusion of the opinion witnesses could have been avoided by more careful attention to the rules of evidence and the rules of criminal procedure. We recognize that presiding over a complex conspiracy case such as this can be confusing and vexatious. When a trial involves multiple defendants and their attendant lawyers opportunities for mistake increase dramatically. It is imperative that the trial judge adopt some method for containing the confusion inherent in such trials. One solution, adopted successfully by other district courts, is the use of a checklist. The list sets forth important evidentiary and procedural points and the order in which they must occur. Through the use of such a list the trial is kept on an orderly course and errors due to simple inadvertence are prevented. We suggest that on retrial a checklist, or some other similar method, might be employed by this District

Court. We also feel compelled to remind all counsel that they are "officers of the court." Being advocates for specific clients does not relieve such officers of their obligation to assist the court, particularly in areas of procedure. We must all be concerned with the smooth operation of our judicial machinery for its ability to function is the cornerstone for protecting the rights of all.

As to the issues, we address them in the order they occurred.

Whether it is error to provide the jury with a taped copy of the instructions to refer to during its deliberations has never been addressed by this Court or any other Court of Appeals.[9] The decision of *United States v. Schilleci,* 545 F.2d 519 (5th Cir. 1977), however, is closely analogous. In *Schilleci,* the trial court furnished the jury with a written copy of its instructions. The Fifth Circuit explained that "[w]hile not error in itself, the practice is conducive to dissection of the charge by the jury and overemphasis of isolated parts rather than consideration of the charge as a whole." *Id.* at 526.[10] *Schilleci* criticizes the practice of giving the jury a copy of the instructions, but it does not label that practice error. It was the presence of other factors prejudicial to the defendant which convinced the *Schilleci* court that reversal was necessary. *Id.* at 526. *See United States v.*

---

**9.** The Seventh Circuit, in dicta, has approved taped charges. "[T]he need for supplemental instructions may be reduced by sending into the jury room at the time the jury retires either a written copy or a tape recording of . . . the complete instructions as given by the court." *United States v. Silvern,* 484 F.2d 879, 883 (7th Cir. 1973) (*en banc*). *But cf. Bustamante v. Eyman,* 456 F.2d 269, 273 (9th Cir. 1972) (defendant had a constitutional right to be present when jury returned to courtroom to hear replay of taped instructions); *Wagner v. State,* 76 Wis.2d 30, 250 N.W.2d 331 (1977) (better practice is to bring jury back into courtroom if instructions are to be replayed).

**10.** Prior to *Schilleci,* Fifth Circuit case law held that the determination of whether or not to furnish the jury with a written copy of the instructions was a matter of discretion for the

trial court. *Stephens v. United States,* 347 F.2d 722, 725 (5th Cir.), *cert. denied,* 382 U.S. 932, 86 S.Ct. 324, 15 L.Ed.2d 343 (1965); *McDaniel v. United States,* 343 F.2d 785, 789 (5th Cir.), *cert. denied,* 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965). This is the rule followed by other circuits. *E.g., United States v. Calabrese,* 645 F.2d 1379, 1388 (10th Cir.), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981); *United States v. Brighton Building & Maintenance Co.,* 598 F.2d 1101, 1107–08 (7th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *United States v. Hill,* 589 F.2d 1344, 1352 (8th Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979); *United States v. Blane,* 375 F.2d 249, 255 (6th Cir.), *cert. denied,* 389 U.S. 835, 88 S.Ct. 41, 19 L.Ed.2d 96 (1967).

*Perez,* 648 F.2d 219, 222 (5th Cir.), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 872, 66 L.Ed.2d 810 (1981); *United States v. Hooper,* 575 F.2d 496, 499 (5th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978).[11]

Appellant Parker argues that providing the jury with a taped copy of the charge is reversible error because prejudicial factors were present. First, Parker claims the trial judge's instruction to the jury that they could replay "all or any part of the instructions" permitted the jury to single out and overemphasize portions of the charge. Second, he asserts that the trial judge's misreading of a sentence when instructing the jury could confuse the jury if that portion of the charge were replayed in the jury room.

As to the first assertion, the trial court was careful to instruct the jury at the beginning of the charge that they should consider the charge as a whole:

> Unless otherwise stated, you should consider each instruction to apply separately and individually to each Defendant on trial and you must follow all of my instructions as a whole. You have no right to disregard or give special attention to any one instruction or to question the wisdom or correctness of any rule I may state to you.

Record, vol. XIV, at 1793.

■ Unlike *Schilleci,* this jury was adequately informed that the whole charge must be considered in reaching their verdict. Against that background, the judge's further instruction regarding use of the tape recorder was not prejudicial.

■ Appellant's second claim of prejudice also lacks merit. The district judge corrected himself in mid-sentence: "But do not consider your—surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict." Record, vol. XIV, at 1807. Taken as a whole the intent of the instruction is clear. It is not confusing or misleading and is certainly not equivalent to the erroneous instruction which was sent into the jury room in *Schilleci.*

■ Although prejudicial circumstances are absent, our inquiry is not ended. Appellants Watson, Williams, King, Berry, and McGlocklin ask this Court to hold that providing a jury with taped instructions is *per se* reversible error. They argue that a taped copy of the charge is more objectionable than a written copy because the tape recorder is in the control of its operator and a tape excerpt is more easily taken out of context. Thus, they stress, the risk that the jury will overemphasize one portion of the charge is increased.

Appellants ask too much. The additional risk of overemphasis which *might* result from use of a tape recorder does not justify automatic reversal. *Schilleci* points out that the practice of providing a written copy of the instructions is "conducive to . . . . overemphasis of isolated parts" and the same would apply to a taped copy. But when the jury is cautioned to consider the charge as a whole and the jury charge is accurate and complete, reversal solely because a taped or a written charge was provided to the jury is not warranted. In fact, under appropriate circumstances, the use of a taped charge or a written charge could well aid juror comprehension, as well as expedite the proceedings. *See Perez,* 648 F.2d at 224 (Fay, J., specially concurring) ("furnishing a [written] copy of the court's instructions to the jury is both sound and proper").

---

11. Specifically, the trial court erroneously instructed the jury by giving a *Mann* charge, *see Mann v. United States,* 319 F.2d 404 (5th Cir. 1963), *cert. denied,* 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964), and by failing to charge that ignorance of the law may be considered in determining whether the accused had specific intent. This error was compounded by the court's failure to instruct the jury to consider the charge as a whole and by the provision of written instructions. 545 F.2d at 524–26.

In any event, appellants in this case were not prejudiced by the taped charge and its use does not constitute reversible error.

Appellants King, Berry, McGlocklin, Parker, and Watson claim the District Court's refusal to follow the dictates of Rule 30 was reversible error.

Under Rule 30, after the jury has been instructed, counsel must be given an opportunity to object to the instructions out of the hearing of the jury. The rule was amended in 1966 to provide that opportunity must be given to object out of the presence of the jury, as well as out of its hearing, if requested by counsel.[12]

At the conference held prior to closing arguments, counsel for appellant Parker specifically requested that a hearing out of the presence of the jury be given at the conclusion of the court's charge:

> THE COURT: What I do is after I send the jury to deliberate on the record I say are there any objections to the charge the Court has given other than as previously noted.
>
> MR. GOLDSTEIN [counsel for appellant Parker]: All right. That will satisfy us. In the event that there are additional objections, may we make a request at this time under Rule 30 that the jury be excused so we can make any objections out of their presence, Your Honor?
>
> THE COURT: You mean if I misread something?
>
> MR. GOLDSTEIN: Yes, Your Honor. If we have something that was not previously logged.

> THE COURT: Okay.

Record, vol. XIII, at 1542.

This request was repeated after the jury was instructed:

> [THE COURT]: Let's give these to the lawyers, a copy of the verdict form for each counsel. Do you wish to approach the bench before the jury retires?
>
> MR. GOLDSTEIN: We would request a Rule 30 conference, Your Honor.
>
> THE COURT: Okay. Approach the bench.
>
> [Whereupon, a bench conference was held.]
>
> THE COURT: Does counsel have any objections to the instructions as given other than as noted in our previous Rule 30 conference?
>
> MR. GOLDSTEIN: Yes, Your Honor. First we would respectfully request a hearing out of the presence of the jury.
>
> THE COURT: What is the basis of it?
>
> MR. GOLDSTEIN: Rule 30.
>
> THE COURT: Well, we are.
>
> MR. GOLDSTEIN: I have an objection and we are out of the hearing of the jury but not out of the presence and I would like the record to reflect that the jury is in the courtroom, and is looking at us right now.
>
> THE COURT: Well, state what your objections are.
>
> MR. GOLDSTEIN: I would like to do this out of the presence of the jury and if the Court insists, I will proceed, Your Honor.
>
> THE COURT: All right.

12. The full text of Rule 30 provides:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. *Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.*

Fed.R.Crim.P. 30 (emphasis added). The rule was amended in 1966 "to permit full argument of objections to instructions." 1966 Amendment Advisory Committee Notes.

MR. GOLDSTEIN: We are preceding [sic] in the presence of the jury. Your Honor, my first objection is . . . .

Record, vol. XIV, at 1809–10.

The trial judge obviously misunderstood the distinction between "out of the hearing" and "out of the presence." The rule clearly makes such a distinction. Again, we suggest that one way to avoid procedural errors is to establish a routine and follow it at every trial by means of a checklist. For example, the preferred procedure for a trial court to follow after completing its charge is to excuse the jury with the admonition that they are not to start their deliberations. Counsel could then be permitted to make objections to the charge out of the presence of the jury. After all objections have been made, the judge should bring the jury back, make any corrections to the charge that are merited, and explain to the jury that they may now start their deliberations. This would also be an appropriate point to check the jury one last time to make sure that all alternates have been discharged before the jury retires to deliberate.

█ In the present case, the District Court did not follow the procedure outlined above. Over counsel's proper request for a hearing out of the presence of the jury, the trial judge required counsel to make objections at a bench conference. This was a clear violation of Rule 30, but reversal based on this error is not required unless we find that appellants were in some way prejudiced. *Hamling v. United States*, 418 U.S. 87, 135, 94 S.Ct. 2887, 2916, 41 L.Ed.2d 590 (1974); *United States v. Salinas*, 601 F.2d 1279, 1282–85 (5th Cir. 1979).

*Salinas* indicates that two different standards have been utilized by the Fifth Circuit in determining prejudice: "(1) such a violation is not reversible error unless the defendant demonstrates that he has been prejudiced; or (2) such a violation is not reversible error where it affirmatively appears that the defendant was not preju-

diced." 601 F.2d at 1283. *Sultan v. United States*, 249 F.2d 385 (5th Cir. 1957), was cited as applying the first standard and *Hodges v. United States*, 243 F.2d 281 (5th Cir. 1957), was cited as applying the second. No attempt was made in *Salinas* to resolve the two cases since the record demonstrated clearly that the defendants were prejudiced. 601 F.2d at 1285. We also find it unnecessary to delve into the propriety of either standard. Applying the more lenient standard (from appellants' viewpoint), we find that it affirmatively appears from the record that appellants were not prejudiced.

Two types of prejudice may result from a failure to allow objections outside the presence of the jury. First, harm may occur if counsel for the defense is placed in a posture of apparent hostility to the trial judge. Second, to avoid that posture, counsel may feel pressured to cut short argument on objections and the court, not being fully advised as to the nature of an objection, may erroneously instruct the jury. *See generally Hamling*, 418 U.S. at 134–35, 94 S.Ct. at 2916; *Salinas*, 601 F.2d at 1283. If prejudice of either type occurs, reversal is required. *See Hodges*, 243 F.2d at 284 (trial judge's remarks in presence of jury were disparaging of criminal lawyers); *Salinas*, 601 F.2d at 1285 (trial judge erroneously instructed jury over defendants' objection in the presence of the jury). Prejudice will not be found, however, if the objections made in the presence of the jury have been previously argued and ruled on by the trial court, or are clearly meritless. *See Hamling*, 418 U.S. at 135, 94 S.Ct. at 2916; *Sultan*, 249 F.2d at 388. In that event, "[w]hatever reaction the jury might have had from seeing or hearing any part of the bench conference [is] the result of counsel's own doings and unnecessary for the preservation of appellant's record of objections." *United States v. Hamling*, 481 F.2d 307, 325 (9th Cir. 1973), *aff'd*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

█ On appeal, appellants stress the validity of three objections that were made at

the bench conference: the tape recorded charge and the judge's failure to require that a record be made of its use; the judge's misreading of a portion of the charge; and the use of a single verdict form. The first objection was repetitious of objections made during the conference held prior to closing arguments and the second objection borders on the frivolous. The third objection also lacks merit. When verdict forms are provided to the jury, "any reasonable form will suffice." *United States v. Lustig*, 555 F.2d 737, 746 (9th Cir. 1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978). Appellants' objection was that the court had not instructed the jurors that they could return a partial verdict and with the single verdict form the jurors might not understand that they could return guilty verdicts against fewer than all of the defendants. The verdict form listed all defendants and next to each name was a space to check either "guilty" or "not guilty". The trial judge explained the verdict form to the jurors and during the charge the jury was instructed that each defendant "should be considered separately and individually." [13] We are satisfied that the jurors understood the nature of their obligation.[14]

■ Two other objections, not discussed by appellants on appeal, were made at the bench conference. Appellants objected that the court gave an improper instruction re-

garding the fifth amendment right not to testify and that the court should not have instructed the jury that "other defendants who have not been apprehended are of no concern to you." We have reviewed the charge and find no error in either instruction.

In summary, five objections were made at the bench conference. All were promptly and properly overruled. The jury was not erroneously instructed, nor were appellants subjected to disparaging remarks by the trial judge in the presence of the jury. Appellants have suffered no prejudice and reversal would be inappropriate for this Rule 30 violation.

One last issue remains to be discussed—the alternate juror. The alternate, through inadvertence, was not excused when the jury retired to deliberate. Approximately thirty-five minutes elapsed before this fact was called to the District Court's attention. The judge immediately called the jury back and excused the alternate who, it turned out, had been elected foreman. About three hours later, in response to a request from the jury for a portion of the trial transcript, the jury was brought back into the courtroom and given a cautionary instruction to disregard any deliberations prior to the alternate being excused.[15] The jury again retired and in forty-five minutes returned with a verdict of guilty as to all appellants. The trial judge then put the

---

**13.** The judge instructed: "The case of each defendant and the evidence pertaining to him should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant." Record, vol. XIV, at 1806.

**14.** The single verdict form is raised as a separate issue on appeal by appellants King, Berry, and McGlocklin. For the reasons given we find no reversible error.

**15.** The District Court gave the following instruction:

You will recall that when you began your initial deliberations included among your number was the alternate juror, Mr. Durden, whom I understand was elected your fore-

man for a short period of time. This of course was my mistake and not your mistake and was sheer oversight. But I now instruct you in order to ensure myself and counsel that the verdict you render in this case represents the individual verdict of each of you, that you disregard any deliberations prior to the election of your now foreman and disregard any part that Mr. Durden played in your deliberations up until the time that he was removed as the foreman and the twelve of you as a jury commenced deliberations. Does everybody understand that instruction? Let the record show that each of the jurors indicated that he understood the Court's instruction.

Record, vol. XIV, at 1837–38.

following question to each juror: "Did the presence of Mr. Durden [the alternate] in the jury room play any part in the verdict you just rendered?" Record, vol. XIII, at 1843. The jurors were individually questioned out of the presence of the other jurors. All responded in the negative. Counsel for appellants asked the judge to inquire of the jurors what, if anything, the alternate said while in the jury room. This request was denied. Consequently, the record, except in two instances, reflects a simple "no" answer from each juror. One juror amplified by stating, "No. We just more or less asked him to be the foreman and we had just started." *Id.* at 1845. Another juror answered, "No, it didn't. We had just elected him." *Id.* at 1848.

■ When the trial judge failed to discharge the alternate juror, Rule 24(c), Federal Rules of Criminal Procedure, was violated. The rule provides: "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." The rule is couched in mandatory language and "should be scrupulously followed." *United States v. Allison,* 481 F.2d 468, 472 (5th Cir.), *aff'd after remand,* 487 F.2d 339 (5th Cir. 1973), *cert. denied,* 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974). Bearing this in mind, our task on appeal is to determine what remedy would be appropriate under the circumstances of this case.

Appellants ask us to treat this violation in the manner taken by the Tenth Circuit in *United States v. Beasley,* 464 F.2d 468 (10th Cir. 1972). In *Beasley,* as in this case, the alternate retired with the jury. About twenty minutes elapsed before the trial court realized the alternate had not been excused. During that time the alternate voted on the foreman and voted to take a lunch break. The Tenth Circuit noted that two approaches could be taken: (1) the trial court could hold an evidentiary hearing to determine "whether the alternate juror's participation exceeded some defined standard"; or (2) the alternate's inclusion "in

*any* proceeding commenced by the jury itself after it retires to deliberate is ground for a mistrial." *Id.* at 469.

Reasoning that the alternate's presence in the jury room invaded the sanctity of the jury and that an evidentiary hearing would also be an intrusion into that sanctity, the *Beasley* court adopted the second alternative.

> When the case was submitted and the jury retired to deliberate, it then, *with the selection of the foreman or with any other act to organize or plan the deliberation, began its own proceedings.* Once these proceedings commenced, "the jury" consisted only of the prescribed number of jurors. The alternate then became as any other stranger to the proceedings regardless of whether she had been discharged.

*Id.* (emphasis added). Thus, a critical point was articulated which, if crossed, would require reversal.

*Beasley* was factually distinguished by the Fifth Circuit in *United States v. Allison.* In that case the trial court was notified prior to the retirement of the jury that one of the jurors had been ill and might not be able to continue. Alternative ways of handling the situation were discussed and defense counsel agreed to a procedure whereby the alternate would sit with the jury while it deliberated, but would be instructed not to participate in any way in the deliberations. 481 F.2d at 469–70. Defendants argued on appeal that, in spite of their stipulation, violation of the rule required automatic reversal.

The Fifth Circuit indicated that it "might agree" under the facts of *Beasley* that reversal was required, but under circumstances where the alternate's presence was stipulated and the alternate was instructed not to participate, remand for an evidentiary hearing was a more appropriate course of action. *Id.* at 471–72. If the hearing revealed that the alternate had participated in the jury's deliberations or that in some other way the alternate's presence might

have affected the jury's verdict, then reversal would be required. But, if there was no "reasonable possibility that the presence of the alternate affected the jury's verdict," reversal would not be necessary. *Id.* at 472.[16]

Under the facts presented, *Allison* followed an approach similar to the first approach noted in *Beasley*. Appellants in the present case urge that, presented as we are with facts so close to the *Beasley* situation, we must follow *Beasley's* rule of automatic reversal rather than *Allison*. It will be recalled that *Beasley* held the idea of jury sanctity to be inviolate. Once the jury took any action after it retired to deliberate, it had begun its proceedings as a separate entity, the alternate was a stranger to those proceedings, and the presence of the alternate required a mistrial. We note that the Second and Fourth Circuit Courts of Appeals have adopted a similar approach. *United States v. Mahler*, 579 F.2d 730 (2d Cir.), *cert. denied*, 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666 (1978); *United States v. Nash*, 414 F.2d 234 (2d Cir.), *cert. denied*, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969); *United States v. Hayutin*, 398 F.2d 944 (2d Cir.), *cert. denied*, 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968); *United States v. Chatman*, 584 F.2d 1358 (4th Cir. 1978); *United States v. Virginia Erection Corp.*, 335 F.2d 868 (4th Cir. 1964). *But see Johnson v. Duckworth*, 650 F.2d 122 (7th Cir. 1981) (in state court trial alternate's presence during jury deliberations did not deny appellants a fair trial); *Potter v. Perini*, 545 F.2d 1048 (6th Cir. 1976) (same). We have carefully considered these cases and the implications of a rule of automatic reversal. Although it is tempting from the standpoint of ease and consistency of application to establish a "critical point" beyond which reversal is required, we believe that such an approach sacrifices too much to achieve simplicity.

Appellants were entitled to a verdict based on the independent judgment of twelve jurors. *See* Fed.R.Crim.P. 23(b). Jury deliberations are kept private and secret to ensure that the verdict represents the judgment of a properly constituted jury and is not affected by outside influences or matters extrinsic to evidence presented at trial. *See Johnson*, 650 F.2d at 124-25. The alternate's presence in the jury room after the jury retired to deliberate was undeniably an intrusion into the sanctity of the jury. If the alternate deliberated with the jury on the question of guilt, or if the jurors' independence of action was in some way restrained or affected by the alternate's presence, then reversal and a new trial would be mandatory. But if no harm resulted from this intrusion reversal would be pointless. We are not of the opinion that merely participating in the selection of a foreman or, indeed, being elected foreman is the equivalent of participating in the deliberations of the jury. The only way to determine whether the alternate in fact participated or affected the verdict is through conducting the evidentiary hearing prescribed by *Allison*.[17]

In this case the trial judge questioned each juror regarding whether the alternate had played any part in the verdict.[18] We are unable to decide based on the jurors'

---

**16.** Automatic reversal was also considered and rejected in *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981). There an alternate juror was substituted for a juror who became ill after the jury retired to deliberate. In view of the procedural safeguards taken by the trial judge we found that there was no possibility of prejudice. Under the circumstances of that case neither reversal nor remand for an evidentiary hearing was required.

**17.** We recognize that the hearing itself represents an intrusion into the privacy of the jury. Under circumstances such as this we believe a hearing limited to a determination of whether the alternate's presence could have affected the verdict is justified. *See generally United States v. Howard*, 506 F.2d 865 (5th Cir. 1975) (allegation of jury irregularity requires evidentiary hearing).

**18.** Appellants complain that the trial judge "telegraphed" the appropriate response to the jurors. They assert that the judge's earlier cautionary instruction to the jury to disregard

answers to this limited inquiry whether the alternate did deliberate on the question of guilt or otherwise affected the verdict. Were this the only issue presented on appeal, we would remand with instructions to conduct a detailed evidentiary hearing

> to determine whether the alternate participated in any way in the deliberations; whether he took part in any votes of the jury; whether he indicated his views regarding any of the defendants in any way—orally or otherwise; and whether the mere presence of the alternate restrained any of the regular jurors in expressing his views or in exercising his independence of thought and action.

*Allison,* 481 F.2d at 472.

 In summary, failure to discharge the alternate when the jury retires is a violation of Rule 24. A mistrial or reversal is required if there is a reasonable possibility that the alternate in any manner affected the verdict. This determination will, in most cases, necessitate an evidentiary hearing.

*Conclusion*

We reverse and remand for a new trial because of the District Court's error in excluding opinion witnesses offered to impeach the credibility of a government witness.

REVERSED AND REMANDED.

---

any deliberation which occurred while the alternate was present preconditioned the jurors to give a negative response to his inquiry. Such an instruction, however, may well have a salutary effect. Courts assume jurors follow instruction. Were it not so it would be a waste of time to give instructions and to review instructions in as much detail as we do. There is nothing improper about "telegraphing" a proper course of action to a deliberating jury. *See United States v. Phillips,* 664 F.2d 971 (5th Cir. 1981) (instruction to jury to begin deliberations anew after an alternate was substituted for a regular juror was one of several factors which prevented the possibility of undue prejudice).